**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| AUTODESK, INC., <br> a Delaware corporation, <br><br>        Plaintiff, <br><br>   v. <br><br> MICHELLE K. LEE, in her capacity as Acting <br> Director of the United States Patent and <br> Trademark Office, <br><br>        Defendant. | **Civil Action No. 1:13cv01464-AJT-JFA** |

**MEMORANDUM IN SUPPORT OF AUTODESK'S
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  PROCEDURAL POSTURE ............................................................................... 3

III. ISSUE PRESENTED .......................................................................................... 5

IV.  STATEMENT OF UNDISPUTED FACTS ....................................................... 6

     A.   Autodesk and AutoCAD® ........................................................................ 6

     B.   Autodesk's DWG™ Technology.............................................................. 6

     C.   Autodesk's Emphatic Use and Promotion of the DWG Mark.............................. 7

          1.   Autodesk Has Spent Millions of Dollars on Advertising Products
               That Feature the DWG Mark ..................................................... 7

          2.   Autodesk Has Displayed DWG Marks on Product Packaging.................. 7

          3.   Autodesk Has Created and Distributed DWG File Icons ......................... 8

          4.   Autodesk Has Displayed DWG-Related Marks on Its Website ................ 9

          5.   Autodesk Has Featured DWG-Related Marks in Its Promotional
               Materials .................................................................... 9

     D.   Autodesk Has Registered Internet Domain Names Incorporating DWG ............ 10

     E.   Autodesk Has Signaled that DWG is an Autodesk Trademark ............................ 11

     F.   Autodesk Has Licensed DWG-Related Marks to Others ..................................... 11

     G.   Autodesk Has Enforced Its DWG Trademark Rights.......................................... 12

     H.   Autodesk Has Secured Trademark Registrations for DWG Marks ...................... 13

     I.   Third Parties Recognize Autodesk's Trademark Rights....................................... 13

     J.   Social Media Users Strongly Associate DWG with Autodesk............................. 14

     K.   Consumers Strongly Associate DWG With Autodesk ........................................ 15

     L.   Autodesk Has Earned Tremendous Revenue from Products Bearing the
          DWG Mark ............................................................................ 16

M.     Autodesk Seeks Protection for DWG as a Mark on Packaging and in Advertising and Marketing ................................................................. 16

N.     The USPTO Has Registered Trademarks Corresponding to File Format Names ............................................................................................. 17

V.     STANDARD OF REVIEW ................................................................. 17

VI.     ARGUMENT ........................................................................................ 18

A.     Summary Judgment Should Be Granted in Favor of Autodesk ........................... 18

B.     Trademarks Corresponding to File Extension Names Are Registrable ............... 19

C.     Autodesk Need Only Establish a *Prima Facie* Case of Acquired Distinctiveness ............................................................................... 19

D.     Acquired Distinctiveness Is Association, and Nothing More ............................... 21

E.     Autodesk's Use Has Created a Statutory Presumption of Acquired Distinctiveness ............................................................................... 22

F.     Autodesk Has Submitted *Prima Facie* Evidence of Acquired Distinctiveness ............................................................................... 23

     1.     Autodesk's Length and Exclusivity of Use ............................................. 23

     2.     Consumer Studies Closely Link DWG to Autodesk ................................ 24

     3.     Third Parties Recognize Autodesk's Trademark Rights ........................... 26

     4.     Autodesk's Efforts to Educate the Public ............................................... 26

     5.     Autodesk's Advertising Expenditures ..................................................... 27

     6.     Autodesk's Sales Success ....................................................................... 27

     7.     Unsolicited Media Coverage of DWG and Autodesk ............................. 27

     8.     Infringers Have Mimicked Autodesk's DWG Mark ............................... 28

     9.     The Totality of the Circumstances Indicate an Exceptionally Strong Showing of Acquired Distinctiveness ........................................... 29

VII.     CONCLUSION ................................................................................... 29

# TABLE OF AUTHORITIES

**Page**

## CASES

*American Ass'n for the Advancement of Science v. Hearst Corp.*, 498 F. Supp
244, 257 (D.D.C. 1980) ...................................................................................22

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................18

*Arrow Fastener Co. Inc. v. Stanley Works*, 59 F.3d 384 (2d Cir. 1995).......................26

*Autodesk, Inc. v. Dassault Systemes Solidworks Corp.*, 685 F. Supp. 2d 1001
(N.D. Cal. 2009)............................................................................16, 17, 25, 28

*Autodesk, Inc. v. Dassault Systemes Solidworks Corp.*, 685 F. Supp. 2d 1023
(N.D. Cal. 2009)............................................................................................17, 19

*Autodesk, Inc. v. Dassault Systemes Solidworks Corp.*, No. C-08-04397-WHA
(N.D. Cal. Jan. 5, 2010) Docket No. 248 ........................................................17

*Black & Decker Corp. v. Int'l Sales & Mktg.*, No. CV-95-2130 JSL, 1995 U.S.
Dist. LEXIS 20120 (C.D. Cal. May 18, 1995) ................................................22

*Black & Decker (U.S.) v. Pro-Tech Power*, 26 F. Supp. 2d 834 (E.D. Va. 1998).........................24

*CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660 (7th Cir. Ill. 2001) ...........................17

*Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794 (9th Cir. 1970)............................21

*Food Fair Stores, Inc. v. Lakeland Grocery Corp.*, 301 F.2d 156 (4th Cir. 1962).......................21

*Germain v. Metheny*, 539 F. Appx 108 (4th Cir. 2013)................................................18

*Glendale Int'l Corp. v. U.S. Patent and Trademark Office*, 374 F. Supp. 2d 479
(E.D. Va. 2005)................................................................................................18

*Harlequin Enters., Ltd. v. Gulf & W. Corp.*, 503 F. Supp. 647 (S.D.N.Y. 1980).........................26

*Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011)............................................................18

*In re Autodesk, Inc.*, Serial Nos. 78852798 78852808, 78852813, 78852822, and
78852843 (T.T.A.B. Sept. 30, 2013) .....................................................4, 5, 20

*In re Capital Formation Counselors, Inc.*, Serial No. 334,716, 1983 TTAB
LEXIS 87 (T.T.A.B. July 19, 1983) ...............................................................20

*In re Fuji Photo Film Co.*, Serial No. 75580709 (T.T.A.B. Dec 19, 2006).....................19

*In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116 (Fed. Cir. 1985).......................21

*Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982).......................................21

*Kappos v. Hyatt*, 132 S. Ct. 1690 (2012) ....................................................................18

*LA Gear Inc. v. Thom McAn Shoe Co.*, No. 88 Civ. 6444 (RJW), 1989 U.S. Dist. LEXIS 4894 (S.D.N.Y. April 20, 1989) ......................................................................24

*Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735, 740 (S.D.N.Y. 1985) ..............................................................................................................22

*Monsieur Henri  Wines, Ltd. V. Duran*, 1979 TTAB LEXIS 81 (T.T.A.B. June 28,1979 .........................................................................................................................25

*McNeil-PPC, Inc. v. Granutec, Inc.*, 919 F. Supp. 198 (E.D.N.C. 1995)....................25

*Paul Frank Indus. v. Sunich*, 502 F. Supp. 2d 1094 (C.D. Cal. 2007) .......................22

*Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121 (4th Cir. 1990) ............21, 23, 27, 29

*Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218 (2nd Cir. 1999)......................................25

*Shuffle Master Inc. v. Awada*, No. 2:05-cv-01112-RCJ-CRJJ, 2006 U.S. Dist. LEXIS 66418 (D. Nev. Aug. 31, 2006) .....................................................................25

*Sunmark, Inc. v. Ocean Spray Cranberries*, No. 93 C 6174, 1994 U.S. Dist. LEXIS 15186 (N.D. Ill. Oct. 13, 1994) .....................................................................22

*Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150 (4th Cir. 2014) .......................18

*Swatch, S.A. v. Beehive Wholesale, L.L.C.*, 888 F. Supp. 2d 738 (E.D. Va. 2012) .......28

*Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277 (7th Cir. 1988)......................25

*Timex Group USA, Inc. v. Focarino*, No. 1:12-cv-1080, 2013 U.S. Dist. LEXIS 177835 (E.D. Va. Dec. 17, 2013) ..................................................................17

*Timex Group USA, Inc. v. Focarino*, No. 1:12-cv-1080, 2014 U.S. Dist. LEXIS 4646 (E.D. Va. Jan. 13, 2014).....................................................................18

*Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339 (S.D.N.Y. 1998) ......................25

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).......................................20

*U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F.3d 517 (4th Cir. Va. 2002) ...........24

*Venetian Casino Resort, LLC v. Venetiangold.com*, 380 F. Supp. 2d 737 (E.D. Va. 2005) .................................................................................................................28

*Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572 (Fed. Cir. 1988)...............20

*Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786 (5th Cir. 1983) ...........24

## STATUTES

15 U.S.C. § 1071(b) .........................................................................................5, 17, 18

15 U.S.C. § 1071(b)(1) ..................................................................................................17

15 U.S.C. § 1052(e)(1)...................................................................................................4

15 U.S.C. § 1052(f)............................................................................................. 4, 19-20, 22

## RULES

Fed. R. Civ. P. 56(a) ....................................................................................................18

## MISCELLANEOUS

J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
     (4th ed. 2014)..........................................................................................3, 22, 24

TRADEMARK MANUAL OF EXAMINING PROCEDURE (2014) ....................................20, 21

## I.       INTRODUCTION

Plaintiff Autodesk, Inc. ("Autodesk") respectfully requests that the Court exercise *de novo* review of the rejection by the U.S. Patent and Trademark Office ("USPTO") of five trademark applications filed by Autodesk in 2006.  The trademark applications seek registration of the mark DWG and variations thereof in connection with design software.  The USPTO maintains that the marks are not sufficiently distinctive.  As set forth in detail below, Autodesk has now submitted to the Court substantial and compelling evidence, most of which is new to the record, demonstrating that these marks have acquired distinctiveness and that thus they are entitled to registration.  Based on the pleadings, the Administrative Record, Autodesk's supporting declarations and expert discovery, there is no genuine issue as to any material fact and Autodesk is entitled to judgment as a matter of law.

Autodesk is a world leader in developing design software for a variety of industries, including the building and construction industries, the manufacturing industry and the media, and entertainment industries.  Since as early as the 1980's Autodesk has developed and distributed software enabling architects, engineers, manufacturers, and other design professionals to build two-dimensional and three-dimensional virtual models of buildings, products, and other physical objects.  Autodesk's computer-aided design ("CAD") software is used by architects and engineers to design and build skyscrapers, bridges, and other complex projects and by industry leaders in manufacturing to design products of all kinds.  Autodesk has branded its software with DWG-related trademarks for years, and users of Autodesk's software have created, viewed, or edited, in all likelihood, billions of designs with the software file name ".dwg" for decades.  Autodesk refers to the proprietary technology underlying many of its software products as "DWG™ technology."

The record of acquired distinctiveness, or secondary meaning, is exceptional.  It reflects:

- Decades of sales activity, culminating in a major DWG branding initiative that started in or about 2006 and continues to this day;

- Millions of consumers who have displayed or used a distinctive DWG icon when creating, viewing, or editing computer files using Autodesk software;

- Over 300 different examples of packaging for Autodesk software products that bear a distinctive DWG mark;

- Hundreds of millions of dollars in annual sales of Autodesk software products bearing the DWG mark;

- Prominent use of the DWG mark on Autodesk's website, which receives millions of "hits" from Internet users each quarter;

- Use by Autodesk over time of a series of DWG-related marks, such as DWG ONLINE, DWG UNPLUGGED, DWG LINKING, AUTODESK VIEW DWGX, 100% PURE AUTOCAD DWG, REALDWG, TRUSTEDDWG, and DWG TRUEVIEW;

- Publication by Autodesk of DWG-specific trademark guidelines;

- Enforcement by Autodesk of its DWG-related trademark rights before the USPTO and in federal district court;

- Licensing by Autodesk of its DWG and DWG-related marks to third parties;

- Registration by Autodesk of the Internet domain name <dwg.com>, other "dwg"-related domain names, and a new top-level domain (gTLD) called <.dwg>;

- Acknowledgement of Autodesk's rights to the DWG mark by large design software trade organizations as well as by Autodesk competitors; and

- Two marketplace surveys from 2005-2006 and 2014, polling a total of over 500 consumers, showing that 42% and 44% of consumers, respectively, associate DWG with a single source, Autodesk.

These facts are illustrative but hardly exhaustive; considerable additional evidence is detailed

below and in Autodesk's declarations.

Secondary meaning, the leading treatise points out, has been defined as "association, nothing more." 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:5 (4th ed. 2014) ("MCCARTHY").  Autodesk's success in conditioning the marketplace to associate DWG with the company, and particularly with its flagship software product AutoCAD®, cannot seriously be questioned.  Moreover, the existence of a ".dwg" software file extension should not pose an obstacle to Autodesk's trademark applications: the USPTO has acknowledged that marks corresponding to file extension names are registrable, and here, the exclusive rights asserted by Autodesk are limited to use of DWG and variations as brands on packaging, and in advertising and marketing.

The USPTO below disregarded the extensive evidence associating DWG with Autodesk, opining – due to the existence of the ".dwg" file extension – that the high level of association should be discounted, or even ignored altogether; that Autodesk's initial consumer survey is "of limited probative value"; and that, generally, the extraordinary popularity of the file extension as used with Autodesk products over decades cannot inure to Autodesk's reputation.  There is, however, no authority for any of these propositions.  The law is clear, to the contrary, that Autodesk should be given full recognition for the strong marketplace association between DWG and the company.

In sum, the Court should recognize the acquired distinctiveness of the DWG mark, overturn the USPTO's rejection of Autodesk's five DWG-related trademark applications, and direct the USPTO to approve the applications for publication.

## II.   PROCEDURAL POSTURE

On April 3, 2006, Autodesk filed applications with the USPTO to register the trademarks DWG, DWG & DESIGN, DWG TRUEVIEW, DWG TRUECONVERT, and DWG EXTREME

(the "Applications").  Administrative Record ("Rec.") A1-9, A1204-12, A1866-74, A2266-74, A2668-74.[1]  The DWG & DESIGN mark appears as follows:



Rec. A1204-12.  The Applications cover computer software in International Class 9.  Rec. A1-9.  The USPTO examined the Applications and, in a series of Office Actions, concluded that DWG is descriptive of the goods claimed in the Applications,[2] and that Autodesk failed to submit sufficient evidence to establish acquired distinctiveness under Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f).  Rec. A1096-100.  In particular, the USPTO refused registration of the mark DWG on the basis of Section 2(e)(i) of the Lanham Act (15 U.S.C. § 1052(e)(1)) and, as to the remaining applications, refused to register them without a disclaimer of exclusive rights to "DWG" apart from the marks as shown.  *Id.*; Rec. A1856-60.

Autodesk appealed this refusal to the USPTO's Trademark Trial and Appeal Board ("TTAB") on December 8, 2011.  Rec. A1101, A1861.  The TTAB, in a decision dated September 30, 2013, affirmed the rejection of the Applications.  *In re Autodesk, Inc.*, Serial Nos. 78852798 78852808, 78852813, 78852822, and 78852843, at 30 (T.T.A.B. Sept. 30, 2013) (hereinafter "*In re Autodesk*").  The TTAB reasoned that the DWG mark is "highly descriptive" and thus subject to a heavier burden of proof; that, due to the existence of a ".dwg" file

---

[1]  Because the Administrative Record for each the Applications is virtually identical, this brief generally cites to the record for the DWG application and only cites to records for the other Applications insofar as there are variations.

[2]  The USPTO maintained that DWG is merely an abbreviation of the word "drawing" and is understood as such by purchasers of design software.  Autodesk disagrees with this finding but is not contesting it on appeal.

extension, the high level of association with Autodesk should be discounted or ignored; that Autodesk's initial consumer survey is "of limited probative value"; and that, generally, the popularity of the ".dwg" file extension as used with Autodesk products cannot inure to Autodesk's reputation.  *Id*. at 17, 20, 29.  The TTAB concluded, based on the record before it at the time (as of 2012), that there was insufficient evidence of secondary meaning.  *Id*. at 29-30.

On November 27, 2013 Autodesk filed this lawsuit seeking *de novo* review of the TTAB ruling.  Docket No. 1.  On January 31, 2014, defendant Lee and the USPTO[3] filed an Answer denying the substantive allegations of the Complaint and asserting various defenses.  Docket No. 15.  On January 31, 2014 the USPTO also submitted to the Court the Administrative Record from the TTAB proceedings below.  Docket Nos. 16-28.

By joint motion dated April 24, 2014, the parties requested a merits briefing schedule and agreed that "if the Court determines after reviewing the briefs of the parties that any material issue of fact exists, the Court is authorized to resolve any such factual dispute."  Docket No. 36.  By order dated May 23, 2014, the Court granted the parties' motion and directed Autodesk to file its motion for summary judgment by July 2, 2014.  Docket No. 40.  Oral argument is scheduled for September 19, 2014.  *Id.*

## III.   ISSUE PRESENTED

Has Autodesk established a *prima facie* showing that a significant number of present or prospective customers associate the mark DWG with a single source?

---

[3] The USPTO currently does not have a Director.  Defendant Michelle K. Lee is Deputy Under Secretary of Commerce for Intellectual Property and Deputy Director of the USPTO; as such, she is the proper party defendant in this action.  15 U.S.C. § 1071(b).  By order dated March 4, 2014, the Court directed that she be substituted in as the sole defendant in place of the initially named defendants: (i) another USPTO Official, Margaret A. Focarino, and (ii) the USPTO itself.  Docket No. 35.  For purposes of this motion, Autodesk refers generally to defendant Lee as the "USPTO."

## IV.     STATEMENT OF UNDISPUTED FACTS

### A.     Autodesk and AutoCAD®

1.     Autodesk is a world leader in design software for the manufacturing, building and construction, and media and entertainment industries.  Maguire Decl. ¶ 3; Rec. A99.  Autodesk is particularly well-known for its computer-aided design (CAD) software products, used by architects, engineers, manufacturers, and others.  Maguire Decl. ¶ 3.  Architects, designers, engineers, manufacturers, and others use Autodesk CAD software to create many types of design projects in various industries.  *Id*. at ¶ 5.

2.     Autodesk's leading software products are its AutoCAD® family of products. Since Autodesk first introduced its AutoCAD® product in 1982, it has become one of the world's leading CAD tools.  Maguire Decl. ¶ 5; Rec. A99.

### B.     Autodesk's DWG™ Technology

3.     Autodesk refers to technology supporting many of its most successful software products, such as AutoCAD®, as "DWG™ technology."  Maguire Decl. ¶ 6; *see also* Rec. A122-3, A648.  DWG™ technology allows users to view, edit, and save CAD files using Autodesk's proprietary .dwg file format.  Maguire Decl. ¶ 6.  Autodesk has routinely upgraded its DWG™ technology with each annual release of AutoCAD®, and its other software products.  *Id*.

4.     Autodesk has distributed software products, including products featuring DWG™ technology, on floppy disks, on compact disks, and on USB flash drives.  Maguire Decl. ¶ 4.  In recent years, Autodesk has released Web-based versions of its software featuring DWG™ technology, available to users via Internet browsers.  *Id.* at ¶¶ 4, 14.

5.     Over time, millions of U.S. users have used Autodesk products featuring DWG™ technology.  Gennarelli Decl. ¶ 6.

6.     Other software developers try to incorporate .dwg file format functionality into their products by reverse-engineering Autodesk's DWG™ technology.  Maguire ¶ 19; Rec. A101, A430.  These companies do so in order to claim that their software products are compatible, or interoperable, with Autodesk's DWG™ technology.  Rec. A101, A202-3.

### C.     Autodesk's Emphatic Use and Promotion of the DWG Mark

#### 1.     Autodesk Has Spent Millions of Dollars on Advertising Products That Feature the DWG Mark

7.     Since 2006 Autodesk has spent between $40 million and $60 million per year to market products that incorporate DWG™ technology and display the DWG mark on their packaging.  Hill Decl. ¶¶ 3, 5, 8, 10; *see* Kuykendall Decl. ¶ 5, Kuykendall Ex. A.

#### 2.     Autodesk Has Displayed DWG Marks on Product Packaging

8.     Since as early as 2006 Autodesk has displayed the DWG & DESIGN mark (referred to herein as the "DWG Logo") on numerous different product boxes.  Kuykendall Decl. ¶ 6, Kuykendall Exs. A, A-2-103, A-105-329; Turbis Decl. ¶ 16; Rec. A100, A108-10, A650, A658-95, A956-7, A963-84.  The DWG Logo displayed on these product boxes appears as follows:



*Id.*

9.     Autodesk has displayed the DWG Logo, in particular, on boxes for at least 327 different Autodesk software products.  *Id.*

10.     Autodesk has shipped the boxes displaying the DWG Logo to distributors, resellers, and end-users of its software.  *See id.*

11.     Autodesk and its distributors and resellers have sold or licensed software featuring the DWG Logo to millions of people.  Rec. A648.

### 3.     Autodesk Has Created and Distributed DWG File Icons

12.     Since at least as early as 2003 Autodesk has presented a distinctive DWG file icon on the computer screens of users of its software products that feature DWG™ technology. Maguire Decl. ¶ 8-9, 12.  Users see such icons when they save, view, or edit ".dwg" design files based upon DWG™ technology.  *Id*.

13.     During 2003-2005 Autodesk presented to users of these products the following file icon:



*Id*. at ¶¶ 8-12, Maguire Exs. 1-4.  As set forth above, this icon features the letters "DWG."

14.      During 2005-2014 Autodesk presented to users of its products featuring DWG™ technology the following file icon:



Maguire Decl. ¶¶ 8, 14-15, Maguire Exs. 5-14.  As set forth above, this icon features the letters "DWG."

15.     These DWG file icons have been viewed or accessed by millions of people. Maguire Decl. at ¶ 8.

### 4.   Autodesk Has Displayed DWG-Related Marks on Its Website

16.     Since at least as early as 2006 Autodesk has prominently displayed the DWG Logo on the homepage and other pages of its main website located at <autodesk.com>.  Buxton Decl. ¶¶ 3-4, Buxton Exs. 1-2.

17.     Since at least as early as 2006 Autodesk has otherwise prominently featured the DWG mark throughout the <autodesk.com> website.  *Id*. at ¶ 5.

18.     The <autodesk.com> website receives extensive "traffic" from Internet users.  For example, during each quarter between January 1, 2012 and March 31, 2014, the website received at least 2,437,000 – and as many as 2,950,000 – unique visitors from the U.S.  Buxton Decl. ¶ 7.

19.     Some Internet users come to the Autodesk website by first making queries of search engines such as Google.  Buxton Decl. ¶ 14.  These Internet users then click on search results linked to the Autodesk website.  *Id*. at ¶ 15.  For example, during the period January 1, 2013 to April 22, 2014, queries by search engine users for the keyword "dwg" resulted in more than 46,000 visits to the <autodesk.com> website or other Autodesk websites.  *Id*. at ¶ 11-13.  During the period November 1, 2011 to March 31, 2014, "dwg" was included in 16 of the top 200 queries that users entered into search engines in order to arrive at the <autodesk.com> website.  *Id*. at ¶ 14.

### 5.   Autodesk Has Featured DWG-Related Marks in Its Promotional Materials

20.     Dating back to at least as early as 1996, Autodesk used variations of DWG-related marks, such as DWG ONLINE, DWG LINKING, 100% PURE AUTOCAD DWG (AND DESIGN), and 100% PURE AUTOCAD DWG, in various promotional materials.  Kuykendall Decl. ¶ 6, Kuykendall Ex. A-1; Rec. A100, A105-7, A652, A713-63.

21.     More recently, Autodesk's marketing materials, including brochures and presentations, its direct e-mail campaigns, and its press releases, have heavily promoted the DWG mark.  Hession Decl. ¶¶ 5-19, Hession Exs. 1-7.

22.     Autodesk and its partners have distributed advertising brochures featuring the DWG mark to hundreds of thousands of people in the U.S. per year.  Hession Decl. ¶ 9.

23.     Autodesk and its partners have distributed or presented marketing presentations featuring the DWG mark to tens of thousands of people.  *Id*. at ¶ 10.

24.     Autodesk also uses direct email campaigns for marketing and advertising.  In 2013, for example, Autodesk conducted several such campaigns featuring the DWG mark. Autodesk sent at least one of these to approximately 139,000 email addresses associated with recipients in North America, the majority of which are in the U.S.  *Id.* at ¶¶ 11-18, Hession Exs. 4-6.

**D.     Autodesk Has Registered Internet Domain Names Incorporating DWG**

25.     Autodesk has registered the Internet domain name <dwg.com>.  Buxton Decl. ¶ 8. Autodesk has re-directed the <dwg.com> domain name to a page within the website at <autodesk.com>.  *Id*. at ¶ 9, Buxton Ex. 6.

26.     Autodesk has registered other domain names that incorporate "dwg," including <dwgtrueconvert.com>, <dwgtrueview.com>, <truedwg.com>, <trusteddwg.com>, and <trusted-dwg.com>.  Buxton Decl. ¶ 16.

27.     Autodesk applied to serve as the global registry for the new generic top-level domain (gTLD) <.dwg>.  Turbis Decl. ¶ 12.  Its application has been approved by the International Corporation of Assigned Names and Numbers (ICANN), the quasi-public agency

that supervises the Internet.  *Id.* ¶ 12, Turbis Exs. 12-4. Autodesk plans to introduce the <.dwg>

extension to the public.  *See* Turbis Decl. ¶ 12.

       **E.**      **Autodesk Has Signaled that DWG is an Autodesk Trademark**

      28.      Autodesk has published a list of its trademarks on its website.  Rec. A652, A764-

852.  This list has included the DWG mark and DWG-related marks since 2007.  *See id.*

      29.      Since 2005 Autodesk has published on its website guidelines concerning third-

party use of DWG-related marks.  Rec. A652; Turbis Decl. ¶ 6, Turbis Ex. 4.

      30.      Autodesk has frequently used the ™ designation signifying "trademark" next to

the DWG mark.  *See*, *e.g.*, Hession Decl. ¶¶ 7-16, Hession Exs. 1-6; Rec. A100, A118-20.

Autodesk has also included trademark notice language referring to the DWG mark with many

published materials and within its software.  *See*, *e.g.*, Hession Decl. ¶¶ 7-12, 19, Hession Exs. 1-

4, 7; Maguire Decl. ¶ 16, Maguire Exs. 15-21.

      31.      Autodesk has regularly issued press releases with notices stating that certain

trademarks, including DWG, "are registered trademarks or trademarks of Autodesk, Inc. in the

USA and/or other countries."  Hession Decl. ¶ 19, Hession Ex. 7.

      32.      As early as 2008 Autodesk began including trademark notices with respect to

DWG in the "About" window of those Autodesk software products featuring DWG™

technology.  Maguire Decl. ¶ 16, Maguire Exs. 15-21.

      **F.**      **Autodesk Has Licensed DWG-Related Marks to Others**

      33.      Autodesk has licensed to third-party software developers the ability to integrate

DWG™ technology into their software products together with the right to use Autodesk's DWG

Logo.  Turbis Decl. ¶ 10.

34.     One Autodesk licensing program – the RealDWG program, which Autodesk has offered since 2006 – has over 150 active licensees.  *Id.*  The license agreements under this program contain a license to the DWG™ logo and the RealDWG™ logo trademarks, among others.  *Id.*, Turbis Ex. 10.

35.     Autodesk has entered into other agreements that include a license to use the DWG mark and/or the DWG Logo.  Turbis Decl. ¶ 11.  For example, one software development agreement grants a trademark license and provides that the developer will include the following statement on all products containing the licensed DWG™ technology: "Contains Autodesk$^{®}$ DWG™ technology by Autodesk, Inc."  *Id.*, Turbis Ex. 11.

### G.     Autodesk Has Enforced Its DWG Trademark Rights

36.     In 2006, Autodesk petitioned the TTAB to cancel a federal trademark registration for the mark DWGEDITOR and opposed a federal trademark application for the mark DWGGATEWAY.  *See*  Rec. A216-8, A508-9, A637-8.  Both marks were owned by an Autodesk competitor, Solidworks.  *See* Turbis Decl. ¶ 4; Rec. A637-8.  Solidworks ultimately surrendered its registration and abandoned its application.  Rec. A637-8.

37.     In 2006, Autodesk petitioned the TTAB to cancel the federal trademark registration for the mark DWGCRUISER owned by Oridus.  *See* Rec. A508, A631-33.  The TTAB cancelled the mark.  *Id.*

38.     In 2007, Autodesk petitioned the TTAB to cancel six federal trademark registrations for OPENDWG marks owned by the Open Design Alliance ("ODA").  Turbis Decl. ¶ 3, Turbis Ex. 2; Rec.507, 640.  The ODA subsequently surrendered its registrations.  *Id.*

39.     In 2007, Autodesk filed a federal lawsuit against the ODA concerning, among other things, false designation of origin based on the ODA's unauthorized simulation of

Autodesk's TrustedDWG software.  Turbis Decl. ¶ 4; Rec. 507, 641-6.  The lawsuit settled

pursuant to a consent judgment enjoining the ODA from engaging in the challenged conduct.  *Id.*

40.     In 2007, Autodesk petitioned the TTAB to cancel the federal trademark

registration for the mark RASTERDWG owned by Softelec GmbH.  Rec. 508, 633-4.  Softelec

subsequently assigned the registration to Autodesk.  *See id.*

### H.    Autodesk Has Secured Trademark Registrations for DWG Marks

41.     Autodesk does business internationally.  It has secured trademark registrations for

its DWG and/or DWG & DESIGN marks in 14 jurisdictions around the world.  Turbis Decl. ¶¶

13-15, Turbis Exs. 15-23; Rec. A654, A878-900, A959-61, A996-1008.  The jurisdictions in

which Autodesk has secured such trademark registrations include English-speaking jurisdictions

such as Canada, the United Kingdom, and Australia.  Turbis Decl. ¶¶ 14-15, Turbis Exs. 18, 20;

Rec. A654, A878-9, A885-7, A959-60, A999-1000.

### I.    Third Parties Recognize Autodesk's Trademark Rights

42.     The ODA is a consortium of companies and organizations focused on design

software.  Turbis Decl. ¶ 3, Turbis Ex. 1.  It has over 1200 members in over 50 countries.  *Id.*  In

a 2010 press release, the ODA acknowledged that "DWG is the name of Autodesk's proprietary

file format and technology used in AutoCAD software and other products, including the recently

released AutoCAD 2011 and RealDWG 2011, and *is an Autodesk trademark*."  Turbis Decl. ¶ 3,

Turbis Ex. 2 (emphasis added).  Since at least as early as 2011 the ODA has stated on its website

that "DWG is . . . a trademark of Autodesk, Inc."  Rec. A959, A991-2.

43.     The IntelliCAD Technology Consortium is another organization of commercial

software developers focused on design software.  Turbis Decl. ¶ 7, Ex. 5. Since at least as early

as 2014 IntelliCAD has stated on its website that "*DWG* is a native file format for Autodesk's

AutoCAD software and *is a trademark of Autodesk, Inc.*" Turbis Decl. ¶ 7, Ex. 6 (emphasis added).

44. Autodesk competitors have publicly recognized Autodesk's rights in the DWG mark. At least six competitors (Parametric Technology Corporation, Bentley Systems, Inc., CMS Software, Siemens Product Lifecycle Management Software, Inc., EMA Design Automation, Inc., Adapx, and IMSI/Design, LLC) have stated on their websites or in press releases that DWG is a trademark of Autodesk. Turbis Decl.¶ 7, Turbis Exs. 7-9; Kuykendall Decl. ¶¶ 9-10, Kuykendall Exs. C-D; Rec. A957-58, A985-95.

45. Other competitors indicate their acknowledgement of Autodesk's trademark rights by incorporating the "™" symbol with the DWG mark when discussing Autodesk's products. For example, Corel Corporation issued a 2008 press release advertising compatibility with various software products, including "AutoCAD® DWG(TM)." Kuykendall Decl. ¶ 8, Kuykendall Ex. B.

## J. Social Media Users Strongly Associate DWG with Autodesk

46. Autodesk monitors online references to its marks and brands on social media networks such as Facebook and Twitter. Commachio Decl. ¶¶ 3-4.

47. According to Autodesk's review of social media sources, for eight of the twelve quarterly periods between April 1, 2011 and March 31, 2014, when social media users referenced the term "dwg," the term "autocad" (the name of Autodesk's most popular software product) was most frequently used with it. *Id.* at ¶¶ 8-20. For all but one of the quarterly periods between April 1, 2011 and March 31, 2014, the term "autocad" was either the term, or tied as the term, most frequently used with "dwg" in social media sources. *Id.* Based on this review, social

media users more strongly associate the word "dwg" with the word "autocad" than with any other term.  *Id.* at ¶ 21.

### K.    Consumers Strongly Associate DWG With Autodesk

48.    Autodesk presented direct evidence of secondary meaning to the USPTO in the form of a 2005-2006 consumer survey by Dr. Deborah Jay (the "Jay Survey").  Rec. A36-97.

49.    The Jay Survey collected responses from 308 consumers of design software, 42% of which associated DWG with Autodesk or its product, AutoCAD®, and 43% of which associated the mark with a single source.  Rec. A36-57.

50.    Dr. Jay stated in her expert report, "It is my opinion, based on my analysis and the results of the . . . Survey, my professional experience and my education, that the . . . Survey supports the conclusion that 'DWG' has acquired secondary meaning with respect to Autodesk and/or AutoCAD when it is used in connection with design software."  Rec. A56.

51.    Autodesk has now submitted to the Court additional direct evidence of secondary meaning via a 2014 survey conducted by Dr. Gerald L. Ford ("Ford Survey").  Ford Decl. ¶ 22, Ford Ex. A.

52.    The Ford Survey measured the level or degree, if any, to which the letters DWG used with packaging, advertising, or marketing materials for design software are associated with a single source.  Ford Decl. ¶¶ 16, 24.

53.    The Ford Survey demonstrated that approximately 44% of relevant consumers associated the letters DWG used with packaging, advertising, or marketing materials for design software emanating from Autodesk.  *Id.* at ¶ 28.

54.    Dr. Ford concluded in his expert report:

It is my opinion that the results of the survey conducted in this matter support a
finding of secondary meaning or acquired distinctiveness for the letters DWG

used with packaging, advertising, or marketing materials for design software. The results of the survey evidence that a substantial segment of the universe associates the letters DWG used with packaging, advertising, or marketing materials with the named source, Autodesk.

*Id.* at ¶ 10.

### L. Autodesk Has Earned Tremendous Revenue from Products Bearing the DWG Mark

55.     Autodesk has earned over $2.6 billion in revenue in the U.S. from the sale of products that display the DWG mark.  Gennarelli Decl. ¶ 5.

56.     Most recently, for each of Autodesk's fiscal years ending 2011 through 2014, Autodesk's net revenues in the U.S. for products that use the DWG mark was over $410 million. *Id.* at ¶ 4.  Similarly, for each of Autodesk's fiscal years ending 2007 through 2010, Autodesk's net revenues in the U.S. for products in featuring DWG™ technology was at least approximately $370 million and as much as approximately $500 million.  Rec. A648-5.

### M. Autodesk Seeks Protection for DWG as a Mark on Packaging and in Advertising and Marketing

57.     Autodesk has sought to protect DWG, specifically as used as a trademark and specifically as applied to packaging, advertising, and marketing materials.  In a 2008 lawsuit before the U.S. District Court for the Northern District of California, *Autodesk, Inc. v. Dassault Systemes Solidworks Corp.*, 685 F. Supp. 2d 1001 (N.D. Cal. 2009), Autodesk claimed that Solidworks misappropriated the DWG mark when it, among other things, adopted and sought to register the marks DWGGATEWAY and DWGEDITOR.  The Court's December 8, 2009 Order in that lawsuit stated:

> Consumers . . . desire interoperability from [Solidworks'] product [with Autodesk's products], and [Autodesk] is not attempting to prevent [Solidworks] from making interoperable products.  [Autodesk] only wants the [sic] prevent the use of the word mark DWG in a way that improperly associates [Solidworks'] products with [Autodesk's].

*Id.* at 1009.  The Court then issued a Memorandum Opinion dated December 31, 2009 in which

it further stated:

> . . . Autodesk disavowed any [trademark] claims against the use of ".dwg" as a
> file extension, and sought trademark protection only for its use as a word mark –
> namely, to have exclusive use of "DWG" in packaging, advertising, and
> marketing materials used in connection with the sale of its goods and services.

*Autodesk, Inc. v. Dassault Systemes Solidworks Corp.*, 685 F. Supp. 2d 1023, 1025 (N.D. Cal.

2009).

58.     On the basis of the distinction with respect to packaging, advertising, and

marketing materials, the parties stipulated that the letter string 'DWG' is a valid trademark

owned by Autodesk for computer-aided design (CAD) software and related services. Joint

Consent Judgment, *Autodesk, Inc. v. Dassault Systemes Solidworks Corp.*, No. C-08-04397-

WHA (N.D. Cal. Jan. 5, 2010) Docket No. 248; *see* Turbis Decl. ¶ 4, Turbis  Ex. 3.

> **N.     The USPTO Has Registered Trademarks Corresponding to File Format
>          Names**

59.     This is not the first time that a trademark applicant has sought registration for a

mark that corresponds to the name of a software file extension.  The USPTO has registered at

least 15 marks corresponding to names of software file extensions. Rec. A951-A952.

## V.     STANDARD OF REVIEW

Autodesk brings this case pursuant to 15 U.S.C. § 1071(b).  This statute permits a

trademark applicant who "is dissatisfied with the decision . . . of the Trademark Trial and Appeal

Board" to seek "remedy by a civil action."  15 U.S.C. § 1071(b)(1); *see CAE, Inc. v. Clean Air*

*Eng'g, Inc.*, 267 F.3d 660, 676 (7th Cir. Ill. 2001) (affirming district court's reversal of TTAB

decision); *Timex Group USA, Inc. v. Focarino*, No. 1:12-cv-1080, 2013 U.S. Dist. LEXIS

177835, at *40 (E.D. Va. Dec. 17, 2013) (reversing TTAB and directing the USPTO to publish

the trademark application).  Significantly, in § 1071(b) civil actions, the parties have "the opportunity to introduce new evidence in support of [their] claims." *Glendale Int'l Corp. v. U.S. Patent and Trademark Office*, 374 F. Supp. 2d 479, 484 n.7 (E.D. Va. 2005).  "[W]here new evidence is submitted, *de novo* review of the entire record is required because the district court 'cannot meaningfully defer to the [TTAB's] factual findings if the [TTAB] considered a different set of facts.'" *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 156 (4th Cir. 2014) (quoting *Kappos v. Hyatt*, 132 S. Ct. 1690, 1700 (2012)); *see also Timex Group USA, Inc. v. Focarino*, No. 1:12-cv-1080, 2014 U.S. Dist. LEXIS 4646, at *2-8 (E.D. Va. Jan. 13, 2014) (Addendum to December 17, 2013 Memorandum Opinion, replacing "more deferential substantial evidence" standard of review with *de novo* standard).

## VI.    ARGUMENT

### A.    Summary Judgment Should Be Granted in Favor of Autodesk

The Court should grant summary judgment where, as here, the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Henry v. Purnell*, 652 F.3d 524, 548 (4th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). Generally, "[a]n otherwise properly supported motion for summary judgment will not be defeated by the existence of any factual dispute; '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Germain v. Metheny*, 539 F. Appx 108, 109 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotations omitted).  Notably, in this action the parties have authorized the Court to resolve any disputes concerning material facts. Docket No. 36.

### B.    Trademarks Corresponding to File Extension Names Are Registrable

As an initial matter, terms such as DWG can serve both as trademarks and file extension names.  In the decision below, the TTAB noted that the USPTO "examining attorney conceded in his brief that a designation may function as both a trademark and as the name of a file format" and that "there is no question that a file extension could serve a tangential purpose of communicating the source of the file or file format."  Rec. 1176-7.  Likewise, in an earlier TTAB decision, *In re Fuji Photo Film Co*., Serial No. 75580709 (T.T.A.B. Dec 19, 2006) (not precedential), the Board held that the mark DPOF was registrable, stating that it "serves both as an initialism for a method of transferring digital images known as 'digital print order format' and as a mark used to identify goods."  *Id*. at 17.  Moreover, the USPTO has issued at least 15 trademark registrations for marks corresponding to names of file extensions; illustrative examples include JAVA; PAGES; ZIP; AIR; SGI; and FBX (all registered with computer software in International Class 9).  *See* Rec. A951-2, A1023-90.

The Court in *Autodesk, Inc. v. Dassault Systemes Solidworks Corp*., 685 F. Supp. 2d 1023, 1028 (N.D. Cal. 2009) specifically distinguished between trademark protection for "word marks" such as DWG used in "packaging, advertising, and marketing," which it deemed appropriate, and trademark monopolies over functional file extensions (such as ".dwg"), about which it expressed concern.  Autodesk seeks registration of its DWG-related marks for use in connection with "packaging, advertising, and marketing."

### C.    Autodesk Need Only Establish a *Prima Facie* Case of Acquired Distinctiveness

Lanham Act § 2(f) provides the basis for the USPTO to issue registrations for marks that have acquired distinctiveness: "Except as expressly excluded in subsections (a), (b), (c), (d), (e)(3), and (e)(5) of this section, nothing herein shall prevent the registration of a mark used by

the applicant which has become distinctive of the applicant's goods in commerce." 15 U.S.C. §
1052(f).  "If a proposed mark is not inherently distinctive, it may be registered on the Principal
Register only upon proof of acquired distinctiveness, or 'secondary meaning,' that is, proof that
it has become distinctive as applied to the applicant's goods or services in commerce."
TRADEMARK MANUAL OF EXAMINING PROCEDURE § 1212 (2014) ("TMEP").[4]  Trademark
applicants must merely make a *prima facie* showing of distinctiveness. *Yamaha Int'l Corp. v.
Hoshino Gakki Co*., 840 F.2d 1572, 1576 (Fed. Cir. 1988); *In re Capital Formation Counselors,
Inc*., Serial No. 334,716, 1983 TTAB LEXIS 87, at *11 (T.T.A.B. July 19, 1983) ("[A]n
applicant need not conclusively establish distinctiveness but need only establish a *prima facie*
case . . . warranting publication of the mark.").

       Trademark applicants do not assume a heavier burden, as the TTAB suggested below,
merely because of evidence of descriptiveness.  Indeed, marks subject to secondary meaning
claims are generally descriptive of the owner's products or services.  *See Two Pesos, Inc. v. Taco
Cabana, Inc*., 505 U.S. 763, 769 (1992).  Here, the USPTO concluded that "DWG" and
"drawing" are synonymous, and Autodesk elected not to appeal that determination.  However,
Autodesk strongly objects to the characterization of DWG by the TTAB as somehow "highly
descriptive" of design software, resulting in a heavier burden of proof.  *In re Autodesk* at 8.

       The record is not sufficient to support any finding that DWG is "highly descriptive."  The
TTAB cited to dictionary definitions from the 1950's and 1960's suggesting that "dwg" was
then, in the context of drafting, a shorthand for the word "drawing."  *In re Autodesk* at 7.  The
USPTO has since identified a website purporting to list architectural definitions and referring to

_____

       [4] The Trademark Manual of Examining Procedure is a manual published by the USPTO for
use by attorneys and trademark examiners. It describes all of the laws and regulations that must
be followed in order to apply for and maintain a trademark in the United States.

"DWG" and "Drawing" together.  These documents do not establish that "DWG" is today

"highly descriptive" of anything, let alone descriptive of software for computer-aided design.  In

any event, courts in the Fourth Circuit have not embraced the notion of placing heavier

evidentiary burdens on some secondary meaning claimants but not on others; nor should this

Court do so.

> **D.     Acquired Distinctiveness Is Association, and Nothing More**

"To establish secondary meaning, a manufacturer must show that, in the minds of the

public, the primary significance of a product feature or term is to identify the source of the

product rather than the product itself."  *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851

n.11 (1982).  According to the Fourth Circuit, "[s]econdary meaning exists if in fact a substantial

number of present or prospective customers understand the designation when used in connection

with a business to refer to a particular person or business enterprise."  *Perini Corp. v. Perini

Constr., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990) (quoting *Food Fair Stores, Inc. v. Lakeland

Grocery Corp.*, 301 F.2d 156, 161 (4th Cir. 1962)).

"Secondary meaning has been defined as association, nothing more."  *Carter-Wallace,

Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970).  The critical component in

secondary meaning analysis is the effectiveness of the trademark owner in conditioning the

marketplace to associate the mark with a single point of origin.  "The ultimate test in determining

whether a designation has acquired distinctiveness is applicant's success, rather than its efforts,

in educating the public to associate the proposed mark with a single source." TMEP § 1212.06;

*see also*, *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 1125 (Fed. Cir. 1985)

(successful showing depends on "the effectiveness of such use to cause the purchasing public to

identify the mark with the source of the product."); MCCARTHY *at* § 15:5 (doctrine is "the law's recognition of the psychological effect of trade symbols upon the buyers mind").

Courts perform a results-oriented analysis, defining secondary meaning with reference to the *level* of marketplace association established by the mark owner. *See, e.g.*, *American Ass'n for the Advancement of Science v. Hearst Corp.*, 498 F. Supp 244, 257 (D.D.C. 1980) (assessing "level of consumer association"); *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735, 740 (S.D.N.Y. 1985) (noting strong mark based upon evidence of "a very high level of recognition"); *Paul Frank Indus. v. Sunich*, 502 F. Supp. 2d 1094, 1098 (C.D. Cal. 2007) (requiring "a level of recognition such that the consuming public would associate the name with a particular source"); *Sunmark, Inc. v. Ocean Spray Cranberries*, No. 93 C 6174, 1994 U.S. Dist. LEXIS 15186, at *24-25 (N.D. Ill. Oct. 13, 1994) (finding "a high level of consumer awareness of the brand"); *Black & Decker Corp. v. Int'l Sales & Mktg.*, No. CV-95-2130 JSL, 1995 U.S. Dist. LEXIS 20120, at *6-7 (C.D. Cal. May 18, 1995) (identifying a "high level of consumer recognition"). The underlying nature of the marketplace association – how exactly it was established and which marketplace stimuli served as triggers – is incidental.

###    E.    Autodesk's Use Has Created a Statutory Presumption of Acquired Distinctiveness

The Lanham Act provides that proof of substantially exclusive and continuous use of a mark for a mere five years may be accepted as *prima facie* evidence of acquired distinctiveness. 15 U.S.C. § 1052(f). Here, Autodesk has made substantially exclusive use of the DWG mark since at least as early as 2006, a period of at least eight years. The mark has appeared, for example, on over 300 examples of packaging for different Autodesk software products, resulting in over a billion dollars of sales. *See* Kuykendall Decl. ¶¶ 5-6, Kuykendall Ex. A; Rec. A648-49; Gennarelli Decl. ¶ 4. Autodesk has also, since at least as early as 2003, presented a distinctive

DWG file icon on the computer screens of millions of users of its software.  Maguire Decl. ¶¶ 8-9, 12.

F.      **Autodesk Has Submitted *Prima Facie* Evidence of Acquired Distinctiveness**

Irrespective of this presumption, Autodesk has submitted *prima facie* evidence of acquired distinctiveness.

The Fourth Circuit has identified a set of non-exhaustive factors to be considered when determining whether a mark has achieved acquired distinctiveness:

> (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use.

*Perini Corp.*, 915 F.2d at 125.  These six factors are not necessarily dispositive, and the Court has discretion to consider other factors as well.  *Id*.  *De novo* review of these and other relevant factors below makes clear that Autodesk has met its burden of establishing acquired distinctiveness in the DWG mark.

1.      **Autodesk's Length and Exclusivity of Use**

The length and exclusivity of Autodesk's use of the DWG mark weighs in favor of secondary meaning.  Autodesk has been making substantially exclusive and continuous use of the DWG mark (on product packaging, in particular) for at least eight years.  *See* Section VI.E, *supra*.  Autodesk's history of use of DWG goes back even further in time.  Autodesk began including DWG file icons with its software as early as 11 years ago; Autodesk previously used other DWG-related marks to promote its products and services[5]; and also, since the early 1980's, Autodesk popularized the file extension ".dwg" in connection with design software.  Maguire

---

[5] During the 1990's Autodesk used the marks DWG ONLINE, DWG UNPLUGGED, DWG LINKING, AUTODESK VIEW DWGX, and 100% PURE AUTOCAD DWG.  Rec. A100, A105-7, A652, A713-63.

Decl. ¶¶ 8-9, 12; Rec. A100, A105-7, A652, A713-63.  Courts have deemed much shorter periods of use as strong evidence of secondary meaning.  *See Black & Decker (U.S.) v. Pro-Tech Power*, 26 F. Supp. 2d 834, 851 (E.D. Va. 1998) (distinctive color scheme achieved secondary meaning within a few months); *LA Gear Inc. v. Thom McAn Shoe Co.*, No. 88 Civ. 6444 (RJW), 1989 U.S. Dist. LEXIS 4894, at *36, 40 (S.D.N.Y. April 20, 1989) *aff'd* in part, *rev'd* in part on other grounds, 98. F.2d 1117 (Fed. Cir. 1993) (secondary meaning based on five months of use).

### 2.      Consumer Studies Closely Link DWG to Autodesk

"Survey evidence is generally thought to be the most direct and persuasive way of establishing secondary meaning." *U.S. Search, LLC v. U.S. Search.com, Inc.,* 300 F.3d 517, 526 fn. 13 (4th Cir. Va. 2002); *see also Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 794-95 (5th Cir. 1983); MᴄCᴀʀᴛʜʏ at § 15.30.  Here, Autodesk has submitted two expert surveys, with similar and compelling results.

First, the Jay Survey from 2005-2006 found that 43% of the relevant consumers associate DWG with design software from a single company or source, and that 42% of the relevant consumers exclusively associate DWG with design software from Autodesk and/or with its leading product, AutoCAD®.  Rec. A36.  Dr. Jay stated, "It is my opinion, based on my analysis and the results of the . . .Survey, my professional experience and my education, that the . . . Survey supports the conclusion that 'DWG' has acquired secondary meaning with respect to Autodesk and/or AutoCAD when it is used in connection with design software."  Rec. A56.

Nine years later, the 2014 Ford Survey showed that approximately 44% of relevant consumers associated the letters DWG used with packaging, advertising, or marketing materials

for design software emanating from Autodesk.  Ford Decl. ¶ 28. [6]  Dr. Ford stated in his expert

report:

> It is my considered opinion… that the results of the survey conducted in this matter support a finding of secondary meaning or acquired distinctiveness for Autodesk's DWG mark used with packaging, advertising, or marketing materials for design software. The results of the survey evidence that the universe associates the letters DWG used with packaging, advertising, or marketing materials for design software with the named source, Autodesk.

Ford Decl. ¶ 29.[7]

Courts reviewing consumer surveys have repeatedly found secondary meaning where

association levels were similar to, and even less than, those in this action.  *See, e.g., McNeil-*

*PPC, Inc. v. Granutec, Inc.*, 919 F. Supp. 198, 202 (E.D.N.C. 1995) (finding a "strong

association" sufficient for secondary meaning where survey revealed 41% of respondents

associated product with single brand, and 38% of respondents recognized source); *Shuffle Master*

*Inc. v. Awada*, No. 2:05-cv-01112-RCJ-CRJJ, 2006 U.S. Dist. LEXIS 66418, at *6-7 (D. Nev.

Aug. 31, 2006) (finding secondary meaning where survey revealed 35% of respondents

associated mark with single source); *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 349

(S.D.N.Y. 1998) (results of 42% of telephone respondents and 51% of mall respondents deemed

probative of secondary meaning); *Monsieur Henri  Wines, Ltd. V. Duran*, 1979 TTAB LEXIS

81, at *12 (T.T.A.B. June 28,1979) (37% association supported secondary meaning finding); *see*

*also Thomas & Betts Corp. v. Panduit Corp*., 138 F.3d 277, 295 (7th Cir. 1988) (survey results

as low as 30% are probative of secondary meaning).

---

[6] The wording "packaging, advertising, or marketing materials" in the Ford Survey tracks the wording of the earlier federal district court ruling in *Autodesk v. Dassault Solidworks*, 685 F. Supp. 1001, *supra*.

[7] The percentage results from the Jay Survey and the Ford Survey are very similar.  "The fact that the two surveys corroborate one another is certainly a point in their favor. . . ." *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 230 (2nd Cir. 1999).

### 3.      Third Parties Recognize Autodesk's Trademark Rights

Key third parties in the design software field, including trade organizations and Autodesk competitors, recognize Autodesk's rights in the DWG mark, further supporting a finding of secondary meaning.  *See Harlequin Enters., Ltd. v. Gulf & W. Corp*., 503 F. Supp. 647, 650 (S.D.N.Y. 1980) ("Whether a given mark has acquired 'secondary meaning' may be determined by such factors as . . . recognition by competitors"); *Arrow Fastener Co. Inc. v. Stanley Works*, 59 F.3d 384, 393-94 (2d Cir. 1995) (upholding secondary meaning determination based in part on evidence of recognition of mark by competitors).  Two large organizations in the design software field, the Open Design Alliance and IntelliCAD Technology Consortium (ITC), have repeatedly acknowledged Autodesk's mark.  Turbis Decl. ¶¶ 3, 7, Turbis Exs. 2, 6; Rec. A959, A991-2.  Autodesk competitors that have acknowledged the DWG mark include: Parametric Technology Corp. (A958, A985-7); Corel Corporation (Kuykendall Decl. ¶ 8, Kuykendall Ex. B); Bentley Systems (A958, A988-90); Adapx (Kuykendall Decl. ¶ 9, Kuykendall Ex. C); IMSI/Design (Kuykendall Decl. ¶ 10, Kuykendall Ex. D); CMS Software (Turbis Decl. ¶ 7., Turbis Ex. 7); Siemens Product Lifecycle Management Software (Turbis Decl. ¶ 7, Turbis Ex. 8); and EME Design Automation (Turbis Decl. ¶ 7, Turbis Ex. 9).

### 4.      Autodesk's Efforts to Educate the Public

Autodesk has pro-actively educated the marketplace about its claim of trademark rights. Autodesk has published DWG-specific trademark guidelines on its website at <autodesk.com> since at least as early as 2005.  Rec. A652.  Autodesk has frequently included the ™ designation next to DWG and has incorporated notices of its claim of trademark rights in press releases and other marketing materials.  Hession Decl. ¶¶ 5-19, Hession Exs. 1-7.  Autodesk has licensed DWG and related marks to hundreds of licensees.  Turbis Decl. ¶ 10.  All of these efforts over

eight years or more have served to condition consumers and business partners to treat DWG as an Autodesk mark, and thus they further corroborate the showing of secondary meaning.

### 5.     Autodesk's Advertising Expenditures

Substantial and systemic advertising and marketing expenditures in support of products bearing a trademark can also be strong circumstantial evidence of secondary meaning.  *See Perini Corp.*, 915 F.2d at 125.  Autodesk's investment in advertising the products with the DWG mark has been considerable.  Since as early as 2007, it has spent tens of millions of dollars annually marketing its products that feature the DWG mark.  Hill Decl. ¶¶ 3, 5, 8, 10; *see* Kuykendall Decl. ¶ 5, Kuykendall Ex. A.  For Autodesk's fiscal years ending 2007 to 2013, it spent between $40 and $60 million per year to market these particular products.  Hill Decl. ¶ 10.  This investment has undoubtedly raised the public profile of these products as well as the Autodesk marks featured with them.

### 6.     Autodesk's Sales Success

Autodesk has been tremendously successful in selling or licensing the products with which the DWG mark has been displayed.  Hundreds of millions of dollars of such products have been sold annually.  For example, for each of Autodesk's fiscal years ending 2011 through 2014, Autodesk's net revenues in the U.S. for products featuring the DWG Logo was over $410 million, and for at least two of those years, over $480 million.  Gennarelli Decl. ¶ 4; *see* Kuykendall Decl. ¶ 5, Kuykendall Ex. A.

### 7.     Unsolicited Media Coverage of DWG and Autodesk

Internet users and the press routinely refer to "DWG" in connection with Autodesk or its software products.  In particular, unsolicited online use of "DWG" together with Autodesk (or its product, AutoCAD®) has been robust.  By way of background, one can track the keywords that Internet users type into search engines directly before they click on the search engine results and

visit a specific website.  Keyword analysis indicates that search engine users strongly associate the term "dwg" with Autodesk.  Buxton Decl. ¶ 11.  From January 1, 2013 to April 22, 2014, for instance, online searches for "dwg" resulted in more than 46,000 visits to the <autodesk.com> website or other Autodesk websites.  *Id.* at ¶ 13.  In addition, from November 1, 2011 to March 31, 2014, "dwg" was included in 16 of the top 200 keywords that users entered into search engine queries in order to arrive at <autodesk.com>.  *Id.* at ¶ 14.  Furthermore, with respect to social media use, Autodesk research indicates that the keyword most frequently associated with "DWG" by users of social media platforms such as Facebook and Twitter has been "autocad," the name of Autodesk's flagship product.  Commachio Decl. ¶ 21.

### 8.  Infringers Have Mimicked Autodesk's DWG Mark

Evidence of litigation and trademark opposition proceedings concerning allegedly infringing marks also supports a showing of secondary meaning.  *See Venetian Casino Resort, LLC v. Venetiangold.com*, 380 F. Supp. 2d 737, 743 (E.D. Va. 2005) (finding that "at least two examples where [it] prevailed in fending off persons who were plagiarizing or infringing" upon a brand owner's marks weighs in favor of distinctiveness); *Swatch, S.A. v. Beehive Wholesale, L.L.C.*, 888 F. Supp. 2d 738, 749 (E.D. Va. 2012) (citing "numerous opposition actions" with the USPTO).  Here, Autodesk's enforcement of its DWG-related trademark rights includes (i) five adversary proceedings before the TTAB against the marks DWG CRUISER, RASTERDWG, DWGEDITOR, DWGGATEWAY, and OPENDWG as well as (ii) two federal district court lawsuits related to Autodesk's TRUSTEDDWG mark and to the third-party mark OPENDWG. *See* Turbis Decl. ¶¶ 3-4, Turbis Exs. 2-3; Rec. A631-46; *Autodesk, Inc. v. Dassault Systemes Solidworks Corp.*, 685 F. Supp.2d 1001; Rec. 507, 641-6.  Significantly, these proceedings all resulted in the abandonment, cancellation or transfer to Autodesk of the disputed marks.  *Id.*

**9.  The Totality of the Circumstances Indicate an Exceptionally Strong Showing of Acquired Distinctiveness**

In sum, applying the *Perini* factors and other relevant factors to the facts of this case, Autodesk is entitled to judgment as a matter of law.  The Court should, via *de novo* review, recognize the wealth of new supporting evidence, particularly with respect to: Autodesk's longstanding and systemic use of the DWG mark; Autodesk's efforts to condition the marketplace to associate DWG with the company; and the unmistakable recognition by consumers and competitors that DWG is an indicator of origin for Autodesk technology and products.

## VII.  CONCLUSION

For the foregoing reasons, Autodesk respectfully requests that the Court reverse the USPTO's refusal of the Applications and direct the USPTO to approve the Applications for publication.

Dated:  July 2, 2014

Respectfully submitted,

VENABLE LLP

/s/ Randall K. Miller
Randall K. Miller
VSB No. 70672
Nicholas M. DePalma
VSB No. 72886
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
(703) 905-1449 (Telephone)
(703) 821-8949 (Facsimile)
rkmiller@venable.com
nmdepalma@venable.com

John L. Slafsky*
Matthew J. Kuykendall*
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, California  94304-1050
(650) 493-9300 (Telephone)
(650) 565-5100 (Facsimile)
jslafsky@wsgr.com
mkuykendall@wsgr.com

*Admitted Pro Hac Vice

Counsel for Plaintiff Autodesk, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on 2nd day of July, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send an e-mail notification of the electronic filing (NEF) to all attorneys registered to receive such notice, including the following:

Ayana N. Free
Assistant U. S. Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Bus:  (703) 299-3785
ayana.free@usdoj.gov

Counsel for Defendant

/s/_____
Randall K. Miller
VSB No. 70672
Nicholas M. DePalma
VSB No. 72886
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
(703) 905-1449 (Telephone)
(703) 821-8949 (Facsimile)
rkmiller@venable.com
nmdepalma@venable.com

Counsel for Plaintiff