**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| AUTODESK, INC., ) <br> A Delaware corporation, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MICHELLE K. LEE, in her capacity as Deputy ) <br> Director of the United States Patent and ) <br> Trademark Office, ) <br> ) <br> Defendant. ) <br> ) | **Civil Action No. 1:13-cv-1464-AJT-JFA** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
**SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant Michelle K. Lee,

in her capacity as Deputy Director of the United States Patent and Trademark Office, hereby

respectfully submits this memorandum of law both in support of the United States Patent and

Trademark Office ("USPTO")'s motion for summary judgment and in opposition to plaintiff's

motion for summary judgment.

**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................1

II.  USPTO STATEMENT OF UNDISPUTED FACTS ...........................................2

    A.  Autodesk's Applications for Registration and the USPTO's Refusals.........................3

    B.  The New Evidence Introduced in This Case.................................................................5

III. AUTODESK'S NEW EVIDENCE IS ALMOST IDENTICAL TO THE EVIDENCE IT PRESENTED TO THE USPTO AND SUFFERS FROM THE SAME FLAWS ............5

IV.  ARGUMENT ...................................................................................................8

    A.  Standard of Review.....................................................................................................9

    B.  "Acquired Distinctiveness" (a/k/a "Secondary Meaning") Generally..........................9

        1.  A Descriptive Term Is Protectable as a Trademark Only Upon Gaining Acquired Distinctiveness. .................................................................................9

        2.  The Standards for Proving Secondary Meaning ....................................................11

    C.  Despite Autodesk's Strenuous Efforts, the Public Continues to Perceive the Term DWG Primarily as a Shorthand for the Drawing Files (.dwg or DWG) That the Software Creates. .....................................................................................................13

        1.  Autodesk Uses DWG Overwhelmingly in Its Descriptive Sense (i.e., to Communicate Information About Its Products)........................................................14

        2.  Being the First to Use and Popularize a Descriptive Term Does Not Equate to Secondary Meaning. ..........................................................................................18

        3.  That the Term DWG Is Well-Known Is Not, By Itself, Probative of Secondary Meaning. ..........................................................................................20

        4.  Autodesk's 2007 and New Surveys Do Not Demonstrate that Consumers View DWG as Indicating the Source of CAD Software, But Rather as a Term that Describes the File Format That Software Creates. ........................................21

        5.  That Others Stop Using a Descriptive Mark When Autodesk Sues Them (or Threatens Litigation) Does Not Equate to Secondary Meaning, But It Does Implicate the Lanham Act's Pro-Competition Policy Against Registering Merely Descriptive Marks. ..................................................................................24

        6.  Foreign Registrations and Prior USPTO Registrations of Other Marks in Other Circumstances Are Irrelevant. ...................................................................26

i

7. Creative Wordsmithing Alone Cannot Create Secondary Meaning Where the Term Nevertheless Stubbornly Retains Its Descriptive Significance to Consumers.................................................................................................27

D. Affirming the Refusal to Register Will Neither Hurt Autodesk Nor Preclude It From Seeking Registration in the Future, But It Will Protect Competition. ...............28

V. CONCLUSION .............................................................................................................30

## TABLE OF AUTHORITIES

**CASES**

*A.J. Canfield Co. v. Honickman*,
808 F.2d 291 (3d Cir. 1986) ........................................................................................... 26

*Amazing Spaces, Inc. v. Metro Mini Storage*,
608 F.3d 225 (5th Cir. 2010 ........................................................................................... 14

*America Online, Inc. v. AT & T Corp.*,
243 F.3d 812 (4th Cir. 2001) .......................................................................................... 17

*American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*,
494 F.2d 3 (5th Cir. 1974) .............................................................................................. 14

*Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*,
685 F. Supp. 2d 1001 (N.D. Cal. 2009) .......................................................................... 25

*In re Bayer AG*,
488 F.3d 960 (Fed. Cir. 2007) .................................................................................. 10, 26

*In re Becton, Dickinson and Co.*,
675 F.3d 1368 (Fed. Cir. 2012) ...................................................................................... 12

*In re Bongrain Int'l Corp.*,
894 F.2d 1316 (Fed. Cir. 1990) ...................................................................................... 14

*In re Boulevard Entertainment, Inc.*,
334 F.3d 1336 (Fed Cir 2003) ........................................................................................ 27

*Braun Inc. v. Dynamics Corp. of Am.*,
975 F.2d 815 (Fed. Cir. 1992) ........................................................................................ 13

*British Seagull Ltd. v. Brunswick Corp.*,
28 USPQ2d 1197 (TTAB 1993) ..................................................................................... 24

*Browne Drug Co. v. Cococare Prods., Inc.*,
538 F.3d 185 (3d Cir. 2008) ........................................................................................... 14

*CareFirst of Md., Inc. v. First Care, PC*,
434 F.3d 263 (4th Cir. 2006 ........................................................................................... 14

*Carter-Wallace, Inc. v. Procter & Gamble Co.*,
434 F.2d 794 (9th Cir. 1970) .......................................................................................... 24

*In re Chem. Dynamics, Inc.*,
   839 F.2d 1569 (Fed. Cir. 1988)......................................................................... 14

*Cicena Ltd. v. Columbia Telecomm. Group*,
   900 F.2d 1546 (Fed. Cir. 1990).......................................................................... 11

*In re Consol. Cigar Corp.*,
   13 USPQ2d 1481 (TTAB 1989); ........................................................................ 25

*Delaware & Hudson Canal Co. v. Clark*,
   80 U.S. 311 (1871)............................................................................................ 10

*In re Deister Concentrator Co.*,
   289 F.2d 496 (CCPA 1961) .............................................................................. 12

*Dena Corp. v. Belvedere Int'l, Inc.*,
   950 F.2d 1555 (Fed. Cir. 1991)...................................................................... 9, 10

*Devcon Corp. v. Woodhill Chem. Sales Corp.*,
   455 F.2d 830 (1st Cir.1972)............................................................................... 26

*Dixi-Cola Labs. v. Coca-Cola Co.*,
   117 F.2d 352 (4th Cir. 1941) ............................................................................ 19

*In re Duvernoy & Sons, Inc.*,
   212 F.2d 202 (CCPA 1954) .............................................................................. 18

*Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*,
   252 U.S. 538 (1920)........................................................................................... 10

*In re Franklin Press, Inc.*,
   597 F.2d 270 (CCPA 1979) .............................................................................. 10

*George & Co. v. Imagination Entm'nt Ltd.*,
   575 F.3d 383 (4th Cir. 2009) ............................................................................ 11

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
   456 U.S. 844 (1982)........................................................................................... 11

*In re Int'l Staple & Mach. Co.*,
   223 F.2d 506 (CCPA 1955) .............................................................................. 18

*Kellogg Co. v. National Biscuit Co.*,
   305 U.S. 111 (1938).............................................................................. 19, 23, 24

iv

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
543 U.S. 111 (2004) ................................................................................................. 10

*In re K-T Zoe Furniture, Inc.*,
16 F.3d 390 (Fed. Cir. 1994) ................................................................................... 10

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ................................................................................... 25

*Levi Strauss & Co. v. Genesco, Inc.*,
742 F.2d 1401 (Fed. Cir. 1984) ............................................................................... 20

*In re McIlhenny Co.*,
278 F.2d 953 (CCPA 1960 ....................................................................................... 14

*Metric Constructors, Inc. v. NASA*,
169 F.3d 747 (Fed. Cir. 1999) ................................................................................. 25

*In re Meyer & Wenthe, Inc.*,
267 F.2d 945 (CCPA 1959) ...................................................................................... 18

*In re Nett Designs, Inc.*,
236 F.3d 1339 (Fed. Cir. 2001) ............................................................................ 9, 27

*OBX-Stock, Inc. v. Bicast, Inc.*,
558 F.3d 334 (4th Cir. 2009) ............................................................................. 10, 11

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
469 U.S. 189 (1985) ........................................................................................... 10, 11

*Perini Corp. v. Perini Constr., Inc.*,
915 F.2d 121 (4th Cir. 1990) ................................................................................... 11

*Qualitex Co. v. Jacobson Prods. Co.*,
514 U.S. 159 (1995) ................................................................................................. 11

*In re Richardson Ink Co.*,
511 F.2d 559 (CCPA 1975) ...................................................................................... 10

*R. J. Reynolds Tobacco Co. v. American Brands, Inc.*,
493 F.2d 1235 (CCPA 1974) .................................................................................... 29

*Roselux Chem. Co. v. Parsons Ammonia Co.*,
299 F.2d 855 (CCPA 1962) ...................................................................................... 18

*Roux Labs., Inc. v. Clairol, Inc.*,

427 F.2d 823 (CCPA 1970) .................................................................................. 13

*Sara Lee Corp. v. Kayser-Roth Corp.*,
81 F.3d 455 (4th Cir. 1996) ................................................................................ 11

*Satellite Tel. & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.*,
714 F.2d 351 (4th Cir. 1983) ................................................................................ 9

*Sheetz of Del., Inc. v. Doctors Assocs. Inc.*,
108 USPQ2d 1341 (TTAB 2013); ...................................................................... 25

*In re Shinnecock Smoke Shop*,
571 F.3d 1171 (Fed. Cir. 2009)........................................................................... 27

*In re Soccer Sport Supply Co.*,
507 F.2d 1400, 1403 (CCPA 1975) .................................................................... 14

*In re Steelbuilding.com*,
415 F.3d 1293, 1300 (Fed. Cir. 2007).................................................................. 12

*In re Stereotaxis, Inc .*,
429 F.3d 1039 (Fed. Cir. 2005)........................................................................ 9, 10

*Tone Bros., Inc. v. Sysco Corp.*,
28 F.3d 1192 (Fed. Cir. 1994).............................................................................. 12

*U.S. Search, LLC v. U.S. Search.com Inc.*,
300 F.3d 517 (4th Cir. 2002) .............................................................................. 11

*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*,
529 U.S. 205 (2000)...................................................................................... 11, 24

*In re Wella Corp.*,
565 F.2d 143 (CCPA 1977) ................................................................................ 25

*William R. Warner & Co. v. Eli Lilly & Co.*,
265 U.S. 526 (1924)............................................................................................ 10

*Yamaha Int'l Corp. v. Hoshino Gakki Co.*,
840 F.2d 1572 (Fed. Cir. 1988)........................................................................... 12

**STATUTES**

15 U.S.C. § 1051(a) .............................................................................................. 3

15 U.S.C. § 1052(e)(1)..................................................................................................... 3, 9

15 U.S.C. § 1052(e)(5)..................................................................................................... 25

15 U.S.C. § 1052(f)............................................................................................................ 4

15 U.S.C. § 1056(a) ......................................................................................................... 5, 9

15 U.S.C. § 1071(b) ............................................................................................................ 9

15 U.S.C. § 1115(b)(4) ..................................................................................................... 26

37 CFR § 2.41(b) .............................................................................................................. 12

## OTHER AUTHORITIES

Trademark Manual of Examining Procedure (Apr. 2014 ed.).............................................. passim

## TREATISES

L. Altman & M. Pollack,
  Callman on Unfair Competition, Tademarks and Monopolies (4th ed. 2009) .................. passim

J. Thomas McCarthy,
  McCarthy on Trademarks and Unfair Competition (4th ed. 2014) .................................. passim

## I.   INTRODUCTION

This case is about whether the public perceives the term DWG as identifying the source of one company's (Autodesk's) computer-aided design ("CAD") software or instead as a descriptor of the kind of digital file that software creates. It is undisputed that "DWG" is the standard abbreviation for "drawing" and has been recognized as such for decades among engineers, architects and others. Plaintiff Autodesk's CAD software creates and works on DWG file format (.dwg) drawing documents. It is undisputed that other companies' CAD software works on the same DWG format. Autodesk does not contest that DWG is descriptive, since it is the name of the thing the software produces.  Importantly, Autodesk always uses the term DWG descriptively (even when it puts the trademark symbol "™" by it), to communicate that the particular software product is compatible with DWG files.

For nearly 140 years, the Supreme Court has emphasized the pro-competitive principle that descriptive terms should remain available for all to truthfully use to sell their products. But if one company succeeds in indoctrinating the public to no longer view the term as a descriptor but instead as a means to identify and distinguish one company's products from another's, then federal trademark law says that the term has gained "acquired distinctiveness" or "secondary meaning" as a trademark. That is what Autodesk argues has happened here. Because this takes a term out of the public domain, the party seeking a trademark monopoly on a descriptive term by proving acquired distinctiveness must satisfy a "rigorous evidentiary standard."

The specific issue in this case is whether Autodesk has satisfied the rigorous standard and has proved that consumers of CAD software no longer view DWG as referring to a CAD software file format, but now, instead, primarily view it as an Autodesk trademark. The answer to that question—which has significant implications in the CAD industry—is "no." But it is important to realize that a "no" answer will have no impact on Autodesk's rights to continue to

1

use DWG precisely as it has for decades. It will only prevent Autodesk from registering DWG

by itself (and, in marks where it's only one component of the mark, without a "disclaimer").

## II.  USPTO STATEMENT OF UNDISPUTED FACTS

This case is primarily about the legal effect of facts that are nearly all undisputed. For this

reason, although the parties have agreed to brief the case on what are nominally cross-motions

for summary judgment, they have further agreed to let the Court resolve any disputes of material

fact it identifies in the record, avoiding the necessity of a trial. Nevertheless, out of an abundance

of caution, the USPTO specifically notes its disputes with the following characterizations

employed by Autodesk, as well as Autodesk's arguments as to their probative value. The USPTO

disputes the following characterizations:

¶ 16 – whether Autodesk "prominently" displays the DWG Logo;

¶ 21 – whether Autodesk "heavily promoted the DWG Mark";

¶¶ 22-24 – Whether its brochures "feature[s] the DWG mark";

¶¶ 48-54 – Characterizations of the evidentiary weight of the Jay and Ford Surveys.

The USPTO notes that Autodesk does not challenge the TTAB's finding that "DWG" is

an established abbreviation of the word "drawing." Br. at 4 n.2; *see also* PTO 37, PTO 1217,

1306.[1] Indeed, its own User's Guides define "DWG" as "standard file format for saving vector

---

[1] References to Autodesk's Summary Judgment Brief, Dkt. No. 43, are identified as "Br. at
__." The Certified Administrative Record was filed with the Court on January 31, 2014, Dkt. No.
16 & 17. References in this Memorandum to the documents in the administrative record are
identified as "A__." Both Autodesk and the USPTO exchanged declarations with exhibits
attaching additional evidence. The USPTO's Declaration of Shane M. Walter with attached
exhibits is filed concurrently with this memorandum and referred to as "Walter Decl." Pages
from the USPTO's submission of new evidence are identified as "PTO___." The Expert Report
of Edward A. Blair, PhD, with attached appendices, is filed concurrently with this memorandum
and referred to as "Blair Rep."

graphics." PTO 886; *see also* A209, 211; PTO 1047. Neither does Autodesk contest that "DWG" is descriptive of its software products. Compl. ¶26.

### A. Autodesk's Applications for Registration and the USPTO's Refusals

Autodesk, Inc. ("Autodesk") filed use-based applications, under Lanham Trademark Act § 1(a), 15 U.S.C. §1051(a), to register the marks DWG,[2] the "DWG logo" ,[3] DWG TRUEVIEW,[4] and DWG TRUECONVERT,[5] and an intent-to-use application under Section 1(b), 15 U.S.C. § 1501(b), for the mark DWG EXTREME,[6] all in connection with "computer software for data management and creation and manipulation of engineering and design data, particularly adapted for engineering, architecture, manufacturing, building, and construction applications, together with instruction manuals sold as a unit; CAD software; computer software for animation, graphics and design modeling applications." A1-9, A1204-12, A1866-74, A2266-74, A2668-74.

The Trademark Examining Attorney initially refused registration of the marks as merely descriptive under Trademark Act Section 2(e)(1), 15 U.S.C. § 1052(e)(1), because DWG describes a function or purpose of the software, *i.e.*, it is an abbreviation for "drawing" and is the name of a CAD software drawing file format. A10-20. To overcome this objection, Autodesk submitted the following evidence which, it argued, demonstrated that, despite the descriptive

---

[2] Serial No. 78852798 (claimed first use on November 28, 2005).

[3] Serial No. 78852808 (claimed first use March 22, 2006).

[4] Serial No. 78852813 (claimed first use November 28, 2005).

[5] Serial No. 78852822 (claimed first use November 28, 2005).

[6] Serial No. 78852843.

3

nature of DWG (which Autodesk did not challenge (A31; *see also* A1113, 1175-76)), the term had "acquired distinctiveness" as a trademark to permit registration under Trademark Act Section 2(f), 15 U.S.C. § 1052(f), A31:

- A purported secondary meaning survey (the "Jay Survey") (A36-97);

- Autodesk officer declarations discussing and/or attaching:

  o  Autodesk's billions of dollars of revenue from sales of software compatible with DWG file format (Strassman Decl. A99-100; Gilmour Decl. A648-49);

  o that several Autodesk software products sport the DWG logo (usually on the back cover) (A100, A109-10, 112, 650, 659-695, 956-57, 964-84);

  o page views and visitors to Autodesk's website (A100-01, 651-52);

  o its program to license "RealDWG" software (along with the DWG mark) to third parties (A101);

  o articles mentioning DWG and Autodesk together (A101); and

  o lists of trademark/product names owned by Autodesk (A700, 765-852);

- Five declarations "from lecturers and writers in the CAD software field" who averred that users of CAD software "associate the term DWG" with Autodesk or AutoCAD (although, notably, they themselves did not say they viewed DWG as a brand name indicating an Autodesk product). A199-205.

- Use of DWG in the phrase "DWG™ technology" (A119, 123) and in other names such as "RealDWG" A122) and "TrustedDWG" (A123);

- Autodesk's U.S. Registration Nos. 2,110,140 and 3,757,650 for the single-term marks RASTERDWG (A185) and REALDWG (A902), respectively;

- Evidence that Autodesk has instituted legal proceedings against third parties who have used DWG in a mark or product name. A187, 508-10, 631-46;

- 3rd party press releases with disclaimers that Autodesk owns the DWG mark; and

- Foreign registrations of DWG and the DWG logo (A879-901, 997-1008).

Primarily because this evidence did not differentiate between use of DWG as a descriptive term and alleged use as a trademark, the Examining Attorney was unconvinced that it

4

sufficed to meet Autodesk's heavy burden to prove acquired distinctiveness under § 2(f). *See* A923-35; *see also* A1096-99 (denying request for reconsideration).[7]

Having failed to convince the Examining Attorney that DWG had acquired distinctiveness, Autodesk appealed the refusals to the Trademark Trial and Appeal Board (TTAB), which consolidated the appeals (A1106-07), and after briefing (A1109-65) and oral argument (A1171), affirmed the refusals. A1172-1201. Autodesk then filed this civil action.

### B.  The New Evidence Introduced in This Case

The evidence before the USPTO and relied upon by the examining attorney and the TTAB is in the administrative record, detailed in the TTAB's decision, and incorporated by reference here. In this case, Autodesk has offered additional declarations and a survey report as new evidence in support of its claim that DWG has acquired distinctiveness to support registration under section 2(f). The USPTO also produced additional evidence—the Walter Declaration and Blair Expert Report—to confirm that the TTAB correctly found that Autodesk has failed to show that DWG has acquired distinctiveness. This evidence is discussed throughout the brief.

### III. AUTODESK'S NEW EVIDENCE IS ALMOST IDENTICAL TO THE EVIDENCE IT PRESENTED TO THE USPTO AND SUFFERS FROM THE SAME FLAWS

In substance, the vast majority of the "new" evidence that Autodesk offers is duplicative of evidence that failed to persuade the TTAB, and suffers from the same flaws:

---

[7] Only Application No. 78852798 (for the term DWG in plain letters) was refused outright; the remaining applications were refused pending a disclaimer of "DWG" under Trademark Act Section 6(a), 15 U.S.C. § 1056(a). *See* A1215-24; A1875-84; A2275-84; A2675-84. Because the reasoning behind the refusals and Autodesk's counterarguments are essentially identical in all the applications, further citations will refer only to the record connected with the mark DWG.

5

| "New" Evidence in This Court | Evidence Submitted to the USPTO |
|---|---|
| **Hession Declaration**<br>Discusses promotion of the phrase "DWG™ Technology" (¶¶3-5, 7-9);<br><br>Promotional publications for Autodesk software products mentioning "DWG™", "DWG™ Technology," and "TrustedDWG". (¶¶5-19) | Gilmour Decl. (A648-50; *see also* A1115);<br><br>A113, 114, 119, 122, 123, 124, 125-26. |
| **Genarelli Declaration**<br>Lists names of Autodesk products using "DWG Technology" (¶3);<br><br>Revenue for these products (¶¶4-5). | List of Trademarks: Gilmour Decl. (A652 ¶ 15 & exh. 17);<br><br>Revenue for Autodesk products with "DWG Technology": Gilmour Decl. (A648-49 ¶¶2-3); Strassman Decl. (A100 ¶12). |
| **Buxton Declaration**<br>Use of DWG logo on the website (¶¶3-6);<br><br>Autodesk website visitors (¶7);<br><br>Autodesk owns DWG.com and other domain names with DWG in them. They re-direct to Autodesk's main site (¶¶8-10, 16);<br><br>Number of Internet searches for DWG that land on Autodesk's website (¶¶11-15). | Use of DWG on website: Strassman Decl. (A100 ¶ 16);<br><br>Website visitors: *Id.* (A100-01 ¶16);<br><br>DWG.com domain name (A511, 917). |
| **Maguire Declaration**<br>Defining "DWG™ Technology": "enables software users to view, edit and save CAD files in Autodesk's proprietary .dwg file format" (¶6);<br><br>Third parties offer products that work on DWG files but they have issues (¶¶17-20);<br><br>Screenshots of what deleting a DWG file looks like (¶¶8-15). | "DWG™ Technology" described in Gilmour Decl. (A648-49 ¶¶2-3); Strassman Decl. (A100 ¶12);<br><br>Third party products (A14, 101, 147, 167, 194, 467) and issues with them (A454-55);<br><br>Screenshots of DWG icon on computer – A104, 650. |
| **Kuykendall Declaration**<br>Copies of product packaging showing DWG logo (exhs. A-1-103, A-104-329);<br><br>Indexes listing Autodesk trademarks (exh. A). | Product packaging: Strassman Decl. (A100, ¶14 & exh. 3);<br><br>Lists of Autodesk trademarks: Gilmour Decl. (A652 ¶ 15 & exh. 17). |
| **Turbis Declaration**<br>Autodesk legal proceedings against use of DWG in a product name or trademark (¶¶2-5); | Autodesk legal proceedings against use of DWG in a product name or trademark (A508-09, 516-39, 631-46, 1116); |

| | |
|---|---|
| Autodesk DWG "trademark guidelines" (¶6); | Autodesk trademark guidelines for "DWG" (A187, 857); |
| Third party acknowledgements of trademark rights in DWG (¶¶7-8); | Third party acknowledgements of trademark rights in DWG (A986-87, 989-90, 992, 994); |
| Licenses of DWG-compatible software which contain limitations on using "DWG" (¶¶9-11); | Licenses – except for RealDWG (A101) refused to disclose software licenses containing use restrictions on term DWG (A186); |
| Foreign Registrations (¶¶13-15). | Foreign Registrations: A879-900 (DWG), 997-1008 (DWG logo). |
| *Hill Declaration* <br> Refers to products with "DWG Technology" as "DWG Family of products" (¶4); <br><br> Autodesk spends between $12 to 30 million/yr. advertising the "family." (¶¶5-10). | "DWG™ Technology" described in Gilmour Decl. (A648-49 ¶¶2-3); Strassman Decl. (A100 ¶12); <br><br> No analog.[8] |
| *Comacchio Declaration* <br> Word clouds – " DWG" is often used in social media in close proximity to the word "AutoCAD," as well as the words "file," "files," "format," and "formats." (*passim*). | No analog. |

Autodesk also offers another survey (the Ford Survey) to replace, or supplement, the Jay Survey. In short, the witnesses' names have changed, but the evidence is largely the same.[9]

Autodesk submits sales figures and advertising expenditures that demonstrate beyond a doubt that Autodesk is a huge, successful CAD software company that works hard to promote itself. Autodesk also lists its many brands and submits copies of product packaging for dozens of CAD software products under myriad brands. All (or at least the vast majority) of these brands create, modify, and/or are compatible with digital drawing documents in DWG format. But only a miniscule number of these brands have ever had, or currently have, "DWG" in their names. And although Autodesk has enjoyed billions of dollars in revenue from these dozens of products,

---

[8] This aspect of the Hill Declaration, as Mr. Comacchio's discussion of "word clouds" in social media, have no probative value and are discussed in §§ IV(C)(1) & -(3), respectively, *infra.*

[9] The failure of the Ford Survey to fix the problem the TTAB found with the Jay Survey (which Autodesk does not address), is discussed *infra*, at § IV(C)(4).

7

it has offered no evidence showing how much revenue it has obtained from products *with DWG in the product name*. Similarly, although Autodesk spends millions advertising these dozens of products, it has offered no evidence showing how much it has spent advertising products *with DWG in the product name*.

More important to the question of how consumers perceive "DWG," however, is how Autodesk itself uses the term. Autodesk makes legalistic attempts to portray DWG as a trademark: using "™" with it; using fine print disclaimers claiming that it is a trademark; issuing "trademark guidelines" for it on the legal pages of its website; suing or threatening companies that use it in product names. Its most recent strategy is to creatively use the phrase "DWG™ Technology" in its promotional material, but even a casual reading of these uses reveals that this is simply a legally-creative attempt to say "this software [creates] [is compatible with] DWG file format documents." Thus, how Autodesk *actually uses* DWG in advertising or packaging—in an *informational* sense, to communicate compatibility with DWG file format—makes clear that the term stubbornly retains its primary, descriptive meaning.

This is confirmed by the recent Ford Survey, which, in addition to containing the same ambiguity—the questions did not differentiate between descriptive and trademark uses—that rendered the 2007 Jay Survey of little use, starkly shows the *opposite* of what Autodesk wants to prove: that, despite Autodesk's efforts, customers understand that DWG refers primarily to the drawing files that are made, modified, or read by Autodesk's (and others') software.

The USPTO discusses this evidence in more detail below in §§ IV(C)(1)-(7), *infra*.

## IV. ARGUMENT

This case presents the question, what, exactly, is acquired distinctiveness? Is acquired distinctiveness, as Autodesk argues, the public's mere association of a word (one which, as Autodesk does not contest, describes a product), with a particular company or its products? Or

does the nature of the association matter? As explained below, the nature of the association is critical: the public's primary perception of a descriptive term must have been transformed from one that describes an aspect of a product into a term that signifies a single source (*i.e.*, is viewed by consumers as the brand of one company only). Accepting Autodesk's "mere association" argument would not only ignore Supreme Court, Fourth Circuit, and Federal Circuit precedent, but would result in adverse effects on competition in the CAD software industry.

## A. Standard of Review

The USPTO does not disagree with Autodesk's statement of the standard of review in this circuit in *ex parte* civil actions under 15 U.S.C. § 1071(b). *See* Br. at 17-18. As to Autodesk's recitation of summary judgment standards (Br. at 18), the USPTO notes that the parties' agreement that the Court may resolve any dispute(s) of material fact it may find means that this case is essentially being submitted for trial on a stipulated record. *See, e.g.*, *Satellite Tel. & Assoc. Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 354 (4th Cir. 1983).

## B. "Acquired Distinctiveness" (a/k/a "Secondary Meaning") Generally

### 1. A Descriptive Term Is Protectable as a Trademark Only Upon Gaining Acquired Distinctiveness.

The USPTO may register a proposed mark only if it meets the requirements of the Lanham Act. Section 2(e)(1) of the Act, 15 U.S.C. § 1052(e)(1), provides that a mark cannot be registered if "when used on or in connection with the goods of the applicant [it] is merely descriptive … of them."[10] A mark or term is merely descriptive if it immediately conveys

---

[10] Because "DWG" is descriptive and lacks secondary meaning, the USPTO refused to register Autodesk's other marks—which included the term DWG—without a disclaimer of the DWG component of those marks. Under Section 6(a) of the Lanham Act, the USPTO can "require the applicant to disclaim an unregistrable component of a mark otherwise registrable." 15 U.S.C. § 1056(a). A disclaimer is proper if a component of a mark is descriptive and would be unregistrable by itself. *In re Stereotaxis, Inc.*, 429 F.3d 1039, 1041 (Fed. Cir. 2005); *Nett Designs*, 236 F.3d at 1341; *Dena Corp. v. Belvedere Int'l, Inc.*, 950 F.2d 1555, 1560 (Fed. Cir.

9

information concerning a feature, quality or characteristic of the goods for which registration is sought. *In re Bayer AG*, 488 F.3d 960, 963 (Fed. Cir. 2007); *OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 340 (4th Cir. 2009) ("Descriptive marks merely describe a function, use, characteristic, size, or intended purpose of the product .…") (citation and internal quotation marks omitted). Marks that describe some feature, function, or characteristic of a product do not qualify for trademark protection automatically. *See, e.g.*, *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985); *OBX-Stock*, 558 F.3d at 340. The major reasons for not automatically protecting descriptive marks are: "(1) to prevent the owner of a mark from inhibiting competition in the sale of particular goods; and (2) to maintain freedom of the public to use the language involved, thus avoiding the possibility of harassing infringement suits by the registrant against others who use the mark when advertising or describing their own products." *In re Abcor Dev. Corp.*, 588 F.2d 811, 813 (CCPA 1978) (citation omitted).[11]

---

1991); *In re Richardson Ink Co.*, 511 F.2d 559, 561-62 (CCPA 1975). The effect of a disclaimer is to disavow any *exclusive* right to use a specified word "except in the precise relation and association in which it appeared in the drawing and description." *In re Franklin Press, Inc.*, 597 F.2d 270, 273 (CCPA 1979). The disclaimer requirement "strikes a statutory balance between two competing trademark principles." *Dena Corp.*, 950 F.2d at 1560. It allows applicants to seek the benefits of registration for composite marks with unregistrable components, while preventing them from claiming exclusive rights to disclaimed portions apart from the whole, so that competitors retain a largely unfettered right to use the descriptive term, thus discouraging unnecessary litigation. *Id.* But if an applicant refuses to disclaim a descriptive component, the USPTO may refuse registration of the entire mark. *E.g.*, *Stereotaxis*, 429 F.3d at 1041; *Richardson Ink*, 511 F.2d at 561-62; TMEP § 1213.01(b). Thus, "[t]he purpose of the disclaimer practice is to enable, not bar, registration." *In re K-T Zoe Furniture, Inc.*, 16 F.3d 390, 394 (Fed. Cir. 1994); *see also Dena Corp.* 950 F.2d at 1560. The registrability of the marks here hinges on whether Autodesk has proven that DWG, a descriptive term, has acquired distinctiveness.

[11] From the 1870s through the present, the Supreme Court has consistently made clear its concern that exclusive trademark rights in descriptive terms not be granted to the first adopter because competitors must remain free to truthfully use the same terms. *See, e.g.*, *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004); *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 529 (1924); *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 543-44 (1920); *Delaware & Hudson Canal Co. v. Clark*, 80 U.S. 311, 327 (1871).

Descriptive marks can qualify for protection, however, if the owner can prove that the mark has "acquired distinctiveness" (also called "secondary meaning"). *See, e.g.*, *Park 'N Fly*, 469 U.S. at 194; *OBX-Stock*, 558 F.3d at 340. Secondary meaning requires proof that, "in the minds of the public, the primary significance of a [mark] is *to identify the source* of the product *rather than* the product itself." *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 211 (2000) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)) (emphasis added); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996).[12] In other words, the letters DWG must have been *transformed* in consumers' minds from a term that describes an aspect of a product into a name for *a brand*. *See, e.g.*, *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163 (1995) (when a mark attains "secondary meaning, that means it "therefore identifies and distinguishes a particular *brand* (and thus indicates its 'source')") (emphasis added).

## 2. The Standards for Proving Secondary Meaning

As befits the remarkable nature of the transformation that secondary meaning represents—one which wrests a descriptive word from the public domain and bestows exclusive rights in it to one company, to potentially wield as a potent legal weapon against competitors— the 4th Circuit has made clear that "secondary meaning entails vigorous evidentiary requirements." *See, e.g.*, *George & Co. v. Imagination Entm'nt Ltd.*, 575 F.3d 383, 395 (4th Cir. 2009) ("Proof of secondary meaning entails a rigorous evidentiary standard."); *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 525 (4th Cir. 2002) (same); *accord Cicena Ltd. v. Columbia Telecomm. Group*, 900 F.2d 1546, 1551 (Fed. Cir. 1990). Autodesk bears the burden

---

[12] *See also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990) ("Secondary meaning is the consuming public's understanding that the mark, when used in context, refers, *not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify*.") (emphasis added).

11

of proving secondary meaning by a preponderance of the evidence. *See, e.g.*, *In re Becton, Dickinson and Co.*, 675 F.3d 1368, 1374 (Fed. Cir. 2012); *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1201 (Fed. Cir. 1994); *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1581 (Fed. Cir. 1988) ("the ultimate burden when registration is sought under Section 2(f) is properly placed on the applicant").[13] And the more descriptive a purported mark is, the harder it is to show that the owner has succeeded at changing consumer perception of it from describing a product feature to identifying a unique source of such products. *See, e.g.*, *In re Steelbuilding.com*, 415 F.3d 1293, 1300 (Fed. Cir. 2007).[14] Here, the TTAB correctly found that DWG is highly descriptive because (1) "DWG" is an established abbreviation for "drawing" in the industries that Autodesk serves (A1178-79) and (2) Autodesk's software is used to create digital drawings. A1179.[15]

---

[13] Seeking a lighter burden, Autodesk misreads *Yamaha* as saying that applicants trying to show secondary meaning need make only a "*prima facie*" case. Br. at 19-20. *Yamaha*, however, says no such thing. On the page cited by Autodesk, the *Yamaha* court was discussing the provision of section 2(f) that provides that the USPTO "may accept" five years of "substantially exclusive and continuous use" of a mark as "prima facie evidence" of acquired distinctiveness. Yamaha, 840 F.2d at 1576. But the USPTO is not "bound to accept it," *In re Deister Concentrator Co.*, 289 F.2d 496, 502 (CCPA 1961), and may, as it did here, require actual proof of acquired distinctiveness in any given case. 37 CFR § 2.41(b); TMEP § 1212.

[14] Autodesk takes issue with this legal principle as well (Br. at 20-21), but points to no cases holding to the contrary. Moreover, this principle is widely accepted by the courts and has been characterized as "sensible." J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§ 15:33, 15:66 (4th ed. 2014) (citing decisions of the Second, Third, Fifth, Ninth, and Federal Circuits) (hereinafter "MCCARTHY"); *accord* L. Altman & M. Pollack, CALLMAN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 20:29, at p. 20-250-251 (4th ed. 2009) (hereinafter "CALLMAN"); *see also* CALLMAN § 20:29, at p. 20-253 (noting that some highly descriptive terms "may defy all efforts, however prolonged and expensive, to vest their usage with secondary meaning").

[15] Autodesk does not contest that DWG is an abbreviation for the word "drawing" among engineers and architects (*see, e.g.*, A256, 259, 261, 263, 266, 271, 273, 277, 279-80), who are among the key users and consumers of Autodesk's software. *See, e.g.*, A452, A1113. Nor does Autodesk challenge the TTAB's finding that ".dwg" is a widely-used file format for digital

**C. Despite Autodesk's Strenuous Efforts, the Public Continues to Perceive the Term DWG Primarily as a Shorthand for the Drawing Files (.dwg or DWG) That the Software Creates.**

The USPTO agrees with Autodesk (Br. at 21) that acquired distinctiveness is not measured by one's efforts to create make a term a source-identifier, but by the *success* of those efforts. *See* Trademark Manual of Examining Procedure ("TMEP") § 1212.06(b) ("The ultimate test in determining whether a designation has acquired distinctiveness is applicant's success, rather than its efforts, in educating the public to associate the proposed mark with a single source.")[16]; *accord Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 826-27 (Fed. Cir. 1992); *Roux Labs., Inc. v. Clairol, Inc*., 427 F.2d 823, 828-29 (CCPA 1970). And there is no question that Autodesk has tried very hard to make DWG into its own brand name. It uses the "™" symbol with it. It warns people on its website, packaging, and advertising, that DWG is a trademark, and that they should not to use it without permission. It sues companies that use DWG in product names. It bought DWG as a top level domain name. It came up with a trademark-related way of saying "this product creates, or works on, DWG file format documents": "DWG™ Technology." But as stated in the preceding paragraph (and as Autodesk acknowledges), it is not the effort that counts, but the results. And here, the results are lacking. As explained below, Autodesk cannot hide that, apart from its trademark warnings, it *always* uses DWG (even when it appears in product names) in its primary, descriptive sense. And— perhaps as a consequence—that is how the relevant public continues to understand it.

---

drawing documents created by CAD software. *See, e.g.*, A446-47, 936. Indeed, Autodesk's marketing materials have claimed that DWG is *the* "most commonly used design data format" in the world. *E.g.*, A119, 123, 449, 463; *cf.* A522, 704, 719, 763.

[16] The TMEP can be found on the USPTO's website at http://tmep.uspto.gov/RDMS/detail/manual/TMEP/current/d1e2.xml.

13

**1. Autodesk Uses DWG Overwhelmingly in Its Descriptive Sense (*i.e.*, to Communicate Information About Its Products).**

Autodesk offers a superficially impressive amount of evidence concerning its advertising and promotion. But Autodesk mistakes quantity for quality, and this evidence is palpably off-target. None of the advertising Autodesk provided is for DWG alone: it usually appears in a distinctive graphic, usually accompanied by the AUTODESK trademark and the specific product trademark/name, which are almost always in larger print. *See* CALLMAN § 20:29, at p. 20-242 ("in the case of a multi-product company, it is necessary to specify how much of the advertising expenditures were devoted solely to the particular mark in litigation").[17] Even more important, however, is that Autodesk itself continues to use the term DWG primarily, if not exclusively, in

---

[17] Sales and advertising figures (*see* Hill Decl.) may not suffice to prove that a mark has acquired distinctiveness where, as the TTAB found (A1195), other marks were featured along with it (or where sales growth could be attributed to the product's popularity). *See In re Bongrain Int'l Corp.*, 894 F.2d 1316, 1318 (Fed. Cir. 1990). Thus, in examining sales success and advertising expenditures, the Federal Circuit has found generalized sales and advertising figures do not establish secondary meaning where the alleged mark is not promoted *by itself* but instead as part of a larger mark or with other designs or marks. *See In re Chem. Dynamics, Inc.*, 839 F.2d 1569, 1571 (Fed. Cir. 1988) (5 years' use of composite mark does not speak to the issue of whether a component is viewed by itself as a mark); *In re Soccer Sport Supply Co.*, 507 F.2d 1400, 1403 (CCPA 1975) (advertising of a design along with word marks lacked the "nexus" that would tie together use of the design and the public's perception of the design as an indicator of source); *In re McIlhenny Co.*, 278 F.2d 953, 956-57 (CCPA 1960) (promotion of a bottle design bearing other trademarks insufficient under § 2(f) to show that the public views the bottle design alone as a trademark). The Fourth and sister circuits agree. *See, e.g.*, *CareFirst of Md., Inc. v. First Care, PC*, 434 F.3d 263, 270-71 (4th Cir. 2006) (evidence "consist[ing] almost entirely of materials that pair the CareFirst mark with the Blue Cross Blue Shield language, usually in a sophisticated corporate logo … does not show that CareFirst's registered mark, standing alone, has conceptual or commercial strength" as an indicator of source); *see also id.* at 269 n.3 (noting that the "commercial strength" and "secondary meaning" analyses are "similar"); *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 248-49 (5th Cir. 2010) (sales/advertising for products bearing star design together with word marks did not raise reasonable inference that the star design itself had secondary meaning); *Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 199-200 (3d Cir. 2008) (sales and advertising of logo containing the words "Palmer's Cocoa Butter Formula" did not "create a reasonable inference that 'Cocoa Butter Formula' has acquired secondary meaning); *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 12-13 (5th Cir. 1974).

14

its descriptive sense, because it, like its competitors, understands that nothing communicates that CAD software is compatible with the popular DWG file format more quickly and efficiently than putting DWG in the product name or otherwise making prominent use of the term. Examples abound in the record. First, Autodesk itself uses DWG descriptively in product names. (*See, e.g.*, PTO 1095 (describing "DWG Mobile Viewer" and "DWG Desktop Viewer" products). Even as to the products bearing some of the "DWG" names at issue in this case, Autodesk's own use makes clear that it uses "DWG" descriptively. *See, e.g.*, PTO 1095 (describing "DWG TrueView software" as "enabling you to view DWG and DXF files"); A119 (same); PTO 990 (describing "DWG TrueView™" as software "To view, plot, and publish DWG® and DXF™ files."); A124 (same); PTO 1025 ("Free DWG Viewing with DWG TrueView - View .dwg files with Autodesk® DWG TrueView™ software. DWG TrueView is a free* stand-alone .dwg viewer that includes DWG TrueConvert™ software. DWG TrueView is built on the same viewing engine as AutoCAD® software, so you can view .dwg and DXF files just as you would in AutoCAD. By installing the free* Autodesk® Design Review software, you can then open .dwg files as well as view, print and track changes to Autodesk 2D and 3D design files without the original design software."); A697 (displaying a graphic hyperlink that says "DWG TrueView. The Original DWG Viewer")[18]; *see also* PTO 1097 (describing "RealDWG" as a "toolkit" that "helps you share design data with confidence using the native DWG file format. So you can create applications with 100 percent DWG read/write capability."); A122 (same). Indeed, even

---

[18] *See also* A124-125 (same); A107 "100% AutoCAD DWG Pure…delivers 100 percent pure DWG file compatibility"); A455 (TrustedDWG™ identifies an Autodesk-generated DWG file by a screen reading "This file is a TrustedDWG"); A456 ("TrustedDWG™" icon "inform[s] the AutoCAD user that the opened DWG file is an authentic Autodesk DWG file"); A123 (same); A459 (same); A125 (listing, as frequently-asked questions for DWG TrueConvert, "What DWG file formats can I convert to?" (and from)); A207 ("DWG Unplugged™ provides a true DWG file read-and-write API").

Autodesk's own User's Guide for AutoCAD 2013 describes DWG as "Standard file format for saving vector graphics." PTO 886.

Moreover, Autodesk's largest use by far of DWG is in logo form , which appears on the packaging for the multitude of non-DWG-named software products[19] Autodesk makes. But even these uses of the DWG logo are descriptive, not source-indicating, uses: they communicate that the software is compatible with DWG file format documents.[20] What is notable about this packaging is that, in it, use of "DWG" (in the logo format) is consistently confined to the back cover of the packaging. The TTAB noted this and was rightly skeptical. A1194-95. Use of the DWG logo on the back cover not only does *not* indicate source (the mark AUTODESK does that), but it does not even communicate the name of the software product (the software products' individualized names do that).

The DWG logo communicates that the particular software product either creates DWG format documents, or is compatible with DWG format documents. First, on many of these back covers,[21] the DWG logo is placed next to *other companies' logos*—which are used to communicate that the particular software is, for example, compatible with Microsoft's Windows

---

[19] Of the 329 products whose packaging is depicted on attachments to the Kuykendall Declaration, the only products whose names contain the term "DWG" are a few years' versions of "RealDWG" and one mention of "DWG Unplugged." *See* "Product Packaging Index" to Kuykendall Decl.; *see also* A765-852 (lists that were before the USPTO).

[20] Indeed, Autodesk concedes elsewhere that, on Autodesk products that are compatible with DWG file format (in Autodesk's parlance, products with "DWG technology"), the DWG logo is used to communicate that DWG files are being worked on. *See* Gilmour Decl. (A650 ¶5: Stating that the "DWG icon" appears on the computer screens of Autodesk product users "when saving design and image files").

[21] Autodesk orders the back covers first in its exhibits, as though they were the front covers.

operating system[22] or other types of software, or that the software complies with certain standards.[23] And on all the other products that do not display third-party logos to communicate compatibility with third-party products, the DWG logo is used precisely the same way on the back covers. More significantly, a visit to Autodesk's webpages (or a look at its publications) for even its products with "DWG" in the name reveals that the term DWG communicates explicitly that the software creates, or works on, DWG files. *See, e.g.*, PTO 1095 ("**DWG Desktop Viewer - Built on the same viewing engine as AutoCAD® software, DWG TrueView software enables you to view DWG and DXF files.**").[24] Autodesk's declarant Mr. Maguire even details (¶¶8-15) how the DWG logo is used on computer screens to indicate when DWG file format documents are being viewed, opened, copied, or moved. *See also* Compl. ¶11; Br. at 8 ¶12. This descriptive use is the opposite of trademark use.

In sum, although Autodesk trumpets that DWG is a trademark, it uses DWG only to communicate descriptive information about its software products: they create, or are otherwise compatible with, DWG file format documents. *See America Online, Inc. v. AT & T Corp.*, 243

---

[22] *See* Kuykendall Exhs. A-11, A-15-16, A-25, A-31, A-58, A-92-95, A-100-101, A-105, A-164-167, A-178, A-181, A-207, A-218-219, A-223, A-227, A-268-269, A-275, A-278, A-306, A-310-313, A-316-317, A-319.

[23] *See* Kuykendall Exhs. A-125-127, A-164-166, A-168, A-213, A-214-217, A-234-243, A-249-251, A-263-267, A-271-272, A-284-291, A-297-299, A-306, A-310-312.

[24] *See also* PTO 1025 ("**Free DWG Viewing with DWG TrueView** - View .dwg files with Autodesk® DWG TrueView™ software. DWG TrueView is a free* stand-alone .dwg viewer that includes DWG TrueConvert™ software. DWG TrueView is built on the same viewing engine as AutoCAD® software, so you can view .dwg and DXF files just as you would in AutoCAD. By installing the free* Autodesk® Design Review software, you can then open .dwg files as well as view, print and track changes to Autodesk 2D and 3D design files without the original design software."); PTO 1285 ("Genuine DWG interoperability with DWG TrueConnect technology"); PTO 990 (describing "DWG TrueView™" as software "To view, plot, and publish DWG® (*sic*) and DXF™ files."); A744 ("Autodesk View DwgX™ Viewer … A full-featured Internet/intranet DWG viewer"); A745 (same); A752; A755; A757; A759.

17

F.3d 812, 822 (4th Cir. 2001) ("Stated otherwise, the repeated use of ordinary words functioning within the heartland of their ordinary meaning ["You Have Mail"], and not distinctively, cannot give AOL a proprietary right over those words, *even if an association develops between the words and AOL.*") (emphasis added); *Roselux Chem. Co. v. Parsons Ammonia Co.*, 299 F.2d 855, 863 (CCPA 1962) (applicant's descriptive use of the alleged "Sudsy" mark undercuts claim of secondary meaning, and even if it "may have caused some users to refer to the product itself as 'Sudsy,'" such use "f[e]ll far short of establishing that this descriptive word has acquired a new primary meaning indicative of the origin of the goods"); *In re Meyer & Wenthe, Inc.*, 267 F.2d 945, 950 (CCPA 1959) (applicant's use of the alleged mark OFFICIAL *in its descriptive sense* "does not establish that the consuming public identifies the origin of this article by the word 'Official'"); *In re Int'l Staple & Mach. Co.*, 223 F.2d 506, 508 (CCPA 1955) (descriptive uses of RETRACTABLE ANVIL do not create secondary meaning in the term); *In re Duvernoy & Sons, Inc.*, 212 F.2d 202, 212 (CCPA 1954) (descriptive use of "Consistently Superior" did not create secondary meaning); *see also* MCCARTHY § 15:52 ("Use of a term in its descriptive sense or in a nontrademark sense is not evidence of secondary meaning."). Even sustained use of a term cannot create proprietary rights in that term if, despite the party's efforts to appropriate it, the term retains its ordinary, nontrademark meaning. *See* CALLMAN § 20:28, at p. 20-210 (noting the existence of "stubbornly descriptive term[s] which simply refuse[] to acquire secondary meaning").

### 2. Being the First to Use and Popularize a Descriptive Term Does Not Equate to Secondary Meaning.

Autodesk emphasizes that its software was the first to create DWG file format drawing documents and its vast success and market dominance in the field of computer-aided design. But this does not prove that DWG now serves as a brand as opposed to representing (as even

Autodesk's own surveys show) a type of product (a digital DWG file format drawing document) created or compatible with Autodesk's design software. *See, e.g.*, *Dixi-Cola Labs. v. Coca-Cola Co.*, 117 F.2d 352, 360 (4th Cir. 1941) ("It is immaterial that the person first adopting the designation made every reasonable effort to [have a descriptive term function as a trademark] or that the designation was coined by him and derived meaning only from his use.") (citation omitted). If Autodesk's claim to have popularized DWG format drawings is right, this case presents a situation like that in *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111 (1938). In *Kellogg Co.*, the inventor of "Shredded Wheat" tried to assert trademark rights in the term, arguing that, because it invented the now-popular product and was its exclusive source for a long time, the public now associated the name of the product with it. The Supreme Court accepted this association as true, yet still refused to grant the primary manufacturer of the product exclusive rights in the term:

> It is contended that the plaintiff has the exclusive right to the name "Shredded Wheat", because those words acquired the "secondary meaning" of shredded wheat made at Niagara Falls by the plaintiff's predecessor. There is no basis here for applying the doctrine of secondary meaning. The evidence shows only that due to the long period in which the plaintiff or its predecessor was the only manufacturer of the product, many people have come to associate the product, and as a consequence the name by which the product is generally known, with the plaintiff's factory at Niagara Falls. But to establish a trade name in the term "shredded wheat" the plaintiff must show more than a *subordinate* meaning which applies to it. It must show that the *primary* significance of the term in the minds of the consuming public is not the product but the producer.

305 U.S. at 118-19 (emphases added); *accord* CALLMAN § 20:28, at p. 20-210 (a mark does not obtain secondary meaning in a situation where "for some reason (e.g., patent protection), one company is the only or dominant source of a particular product for a period of time, during which a descriptive term, without losing its primary significance, also becomes associated in the minds of purchasers with that particular source").

19

Here, Autodesk claims that decades ago it invented, and then made popular, CAD software that generates DWG file format drawing documents. As a consequence, the relevant group of purchasers may well associate DWG file format documents—*i.e.*, the *product* that Autodesk's software creates—with Autodesk. But it is undisputed that others also distribute software that creates or works on DWG file format documents (*e.g.*, A14, 101, 147, 167, 194, 452-61, 467; PTO 21, 31-32, 34-39, 88-89, 91), and, Autodesk has told the TTAB and at least one other district court (A1182) that it does not claim trademark rights in use of DWG as a file format. Further, the record contains substantial evidence that third parties make use of DWG in their software product names to instantaneously communicate to potential purchasers/users that the software is compatible with DWG file format.[25] *See, e.g.*, *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1403 (Fed. Cir. 1984) (evidence of third party use is highly significant because acquired distinctiveness requires the consuming public to perceive the alleged mark "as indicating one source of quality control and thus one quality standard"). In these circumstances, the mere association of a document file format with, among others, the company that invented it, does not show that the public *primarily* views it as an indicator that the source of the DWG document or DWG-compatible software is Autodesk and Autodesk alone.

### 3. That the Term DWG Is Well-Known Is Not, By Itself, Probative of Secondary Meaning.

In a related argument regarding how well-known it has made the term DWG, Autodesk offers employee declarations averring that people who end up on Autodesk's website frequently

---

[25] *See, e.g.*, PTO 1162 (noting the "DWG's" may be "created or saved by non-Autodesk non-RealDWG products"), A14, 101, 156, 167-68, 169, 171, 173, 176-77, 178-79, 180-81, 446-47, 452-61, 522. Indeed, Autodesk's own publications concede that DWG is one of the most commonly used, if not the most commonly used, design data formats. PTO 1025; A119, 123, 704, 719, 763. And use of DWG does not indicate one quality standard, judging from Autodesk's promotional efforts to teach consumers that DWG documents created by others' software may be inferior to DWG documents created by Autodesk software. *See, e.g.*, A454-55, 463, 704.

use DWG as a search term on Internet search engines (Buxton ¶¶13-15) and that, in social media, the term DWG frequently appears near Autodesk or AutoCAD (Comacchio ¶¶9-20).[26] All this evidence shows is that DWG is a well-known term and that DWG file format is popular (and without context for comparison, it shows that only roughly). But without more, this type of is evidence is irrelevant. A crucial link is missing—there is nothing to show that consumers perceive DWG as an indicator of the software's source or brand, as opposed to a file format document created by CAD software. Two of the leading treatises criticize this type of evidence:

> Secondary meaning is not necessarily the same as popularity. Evidence which merely shows that a product is popular is not probative evidence of secondary meaning in the trademark for that product. Popularity of a product is not synonymous with secondary meaning. Large sales of the product may be due to dozens of factors, only one of which may be the drawing power of the trademark. To make popularity relevant as evidence, causation between the trademark and the popularity must be proved. Even popularity of the word said to be a mark may not indicate that buyers associate the word with only one source. That is, if the word is descriptive, the primary meaning of the word may be what is well known among buyers, not its alleged secondary meaning as a symbol of commercial identification.

MCCARTHY § 15:47; *see also* CALLMAN § 20:29, at p. 20-242 ("[M]ere popularity is not enough to support a finding of secondary meaning"). The term DWG may be well-known, and may even be associated with Autodesk, but that fails to advance Autodesk's argument because consumers recognize it as a file format.

### 4. Autodesk's 2007 and New Surveys Do Not Demonstrate that Consumers View DWG as Indicating the Source of CAD Software, But Rather as a Term that Describes the File Format That Software Creates.

Neither the 2007 Jay Survey nor the 2014 Ford Survey demonstrates that consumers view DWG as an indicator of source. If they prove anything, it is that DWG's descriptive connotation

---

[26] That DWG frequently is mentioned alongside AutoCAD or Autodesk is neither surprising nor proves that DWG serves as an indicator of source, since the "thing" that Autodesk's AutoCAD software *creates* are DWG drawing files.

stubbornly retains primacy, despite Autodesk's legal efforts, during the seven-year period between the surveys, to convert it to a trademark.

The USPTO agrees that a properly-constructed survey can be highly probative. But the TTAB correctly found the 2007 Jay Survey to be flawed because, *inter alia*, the question it asked did not differentiate between use of DWG as a product descriptor and as an indicator of source (*i.e.*, a trademark). A1189-91.[27] Thus, one could not tell whether the respondents thought DWG was a product (a digital drawing document) they associated with Autodesk software or whether they thought DWG was a brand owned by Autodesk. The main change the new Ford Survey makes is to specifically ask the respondents about whether they associate DWG with any company's packaging, advertising, or marketing material.[28] But as the USPTO's survey expert, Professor Edward Blair, pointed out, this distinction does not eliminate the ambiguity that the TTAB identified in the Jay Survey: that one cannot tell whether affirmative responses were referring to an association of the *product* (*i.e.*, a DWG file format drawing document) with Autodesk or an association reflecting that the respondents viewed DWG as a *brand* that *identified the source* of the product. Blair Rep., at 10-12; *compare* A1190-91 (TTAB criticism of Jay Survey). Just because a term is used on a product package or advertising does not mean that term is a trademark, because such materials also commonly display descriptive terms. *Id.*, at 9 n.4; *accord* MCCARTHY § 11:46 ("emphasis of a term on a label, packaging, or advertising does not necessarily mean that the term is being used in a trademark sense") (footnote omitted). More important, even though no follow up question was asked about the nature of the association,

---

[27] The question at issue in the Jay Survey was: "Do you associate the name or term 'DWG' with design software from any particular company or companies?" A1254.

[28] The Ford Survey asked: Do you associate the capital letters you see on your screen [DWG] with packaging, advertising, or marketing materials for design software from any company or companies?" Ford Report at p.10.

thirty-four (34) respondents in the Ford Survey spontaneously stated that they understood DWG to be a file format used in CAD software. Blair Rep. at 9-11. Only one respondent specifically indicated (arguably) that he/she understood DWG to be a trademark. *Id.*

The evidence in the record shows that Autodesk *itself* uses DWG to refer to DWG file format documents (*i.e*., the DWG product) on its "packaging, advertising, or marketing materials." *See infra* § IV(C)(1). Thus, this question still contains the very ambiguity that marred the Jay Survey. And the responses only highlight the ambiguity: even though the questions didn't mention DWG as a file format, several respondents—unprompted—blurted out that DWG is a file format. *See* Blair Rep. at 10 & Appendices 5 & 6 (citing instances); *see also* PTO 39 (page in textbook stating "The DWG format and the other AutoCAD file format (DXF: Drawing Exchange Format) have become de facto standards for 2D CAD data interoperability."); A178 (Apple webpage describing DWG as "industry standard"). Indeed, even Autodesk's own User's Guide for AutoCAD 2013 describes DWG as "Standard file format for saving vector graphics." PTO 886; *see also* A209, 763; PTO 1047. As Professor Blair points out in his report, what this means is that in the Ford Report (as in the Jay Report before it), it is simply unreasonable to infer, as a matter of logic and survey science, that simple affirmative responses indicate that the association the respondents are affirming is one of DWG/brand. Blair Rep. at 10-11. Instead, *the far more likely and supportable inference* is that the respondents who simply mentioned Autodesk or AutoCAD were making a *DWG/product association*.

Autodesk tries to sidestep this flaw by arguing that secondary meaning is *any* association. Br. at 3, 21. But the Ninth Circuit decision it cites explains this cryptic comment by quoting the Supreme Court: the party trying to show a valid trademark "must show that the primary significance of the term in the minds of the consuming public is not the product but the

producer." *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. at 118 (quoted in *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970)). *Kellogg* is still the law, however, which means that the nature of the association *does* still matter: it cannot simply indicate the product; it must indicate source. *See, e.g.*, *Wal-Mart Stores*, 529 U.S. at 211 (secondary meaning means that, "the primary significance of a [mark] *is to identify the source of the product rather than the product itself*") (emphasis added). Indeed, that is the statutory definition of a trademark: "to identify and distinguish [the owner's] goods … from those manufactured or sold by others and to indicate the source of the goods …." 15 U.S.C. § 1127. It is not enough that consumers quite naturally associate "DWG" with Autodesk, the biggest seller of CAD software.

In sum, the two surveys suffer from the same fatal flaw: because of the question asked and the lack of a follow-up question, at best, one cannot tell whether those respondents who associated DWG with Autodesk were associating DWG as a *brand* or *trademark* of Autodesk or were making an association between DWG format documents and Autodesk's software.[29]

### 5. That Others Stop Using a Descriptive Mark When Autodesk Sues Them (or Threatens Litigation) Does Not Equate to Secondary Meaning, But It Does Implicate the Lanham Act's Pro-Competition Policy Against Registering Merely Descriptive Marks.

As it did before the USPTO, Autodesk boasts that it has instituted legal proceedings against several companies that have used DWG in various product names and/or trademarks. *See* Turbis Decl. ¶¶ 3-5; Br. at 28. The threat of harassing lawsuits directed toward use of descriptive terms is precisely the reason why the law denies automatic protection to descriptive marks. *See,*

---

[29] *Cf. British Seagull Ltd. v. Brunswick Corp.*, 28 USPQ2d 1197, 1202-03 (TTAB 1993) (the TTAB found an "association" survey unpersuasive where the applicant had sold large numbers of products bearing the purported mark (the color black for outboard engines) for a long time, noting that: "This evidence does not prove that these people believe that all black engines come from applicant or from any single source. It proves only that responsive to the survey question, they could name applicant as a maker of black engines."), *aff'd on other grounds*, 35 F.3d 1527 (Fed. Cir. 1994).

24

*e.g.*, *Abcor Dev. Corp.*, 588 F.2d at 813 (identifying the policy "of harassing infringement suits by the registrant against others who use the mark when advertising or describing their own products") (citation omitted). More important (and as the TTAB noted, *see* A1198-99), it is significant that Autodesk cannot point to a judicial determination in *any* of these cases that DWG has secondary meaning,[30] or that the party Autodesk sued had infringed the alleged "DWG" mark by its own use of a DWG mark or product name. Instead, it appears that all of these parties simply settled rather than face potentially expensive and protracted litigation. This does not demonstrate distinctiveness. *See In re Wella Corp.*, 565 F.2d 143, 144 n.2 (CCPA 1977) ("Appellant argues that various letters (of record) from competitors indicating their discontinuance of use of its mark upon threat of legal action are evidence of its distinctiveness, but we agree with the TTAB that such evidence shows a desire of competitors to avoid litigation rather than distinctiveness of the mark.").[31] All this evidence demonstrates is that Autodesk is ready, willing, and able to engage in the behavior that the rule against monopolizing descriptive terms was designed to *prevent*: wielding threats of legal action whenever a competitor uses

---

[30] The district court in *Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, 685 F. Supp. 2d 1001 (N.D. Cal. 2009) expressly noted that its ruling "*does not mean the mark is valid*, only that it is not invalid *due to functionality*." *Id.* at 1010 (emphasis added). Trademark law's functionality doctrine prohibits registration of trademarks (usually in the form of product feature trade dress) that make a product work, or work better. *See* 15 U.S.C. § 1052(e)(5)); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 161-64 (4th Cir. 2012). The refusal at issue in this case did not raise a functionality objection.

[31] *See also Sheetz of Del., Inc. v. Doctors Assocs. Inc.*, 108 USPQ2d 1341, 1370 (TTAB 2013); *In re Consol. Cigar Corp.*, 13 USPQ2d 1481, 1483 (TTAB 1989); TMEP § 1212.06(e)(iv); *cf. LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77-78 (Fed. Cir. 2012) (discounting probative value of royalty rates in a settlement because they may reflect a desire to avoid further litigation costs); *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 753 (Fed. Cir. 1999) ("Many factors influence negotiations, not the least of which is the desire to avoid costly litigation.")

DWG descriptively in a product name to quickly communicate to consumers that its products are compatible with DWG file format drawings.[32]

Also of minimal probative value are recitations, in software licenses, on the ancillary issue of supposed trademark rights. Even where the trademark itself is the primary subject of the license, such recitations are worth little. *See, e.g.*, CALLMAN § 20:29, at p. 20-215 ("Recitations of secondary meaning in a trademark license are not enough to establish its [secondary meaning's] existence.")

### 6. Foreign Registrations and Prior USPTO Registrations of Other Marks in Other Circumstances Are Irrelevant.

Autodesk half-heartedly argues that the Court should allow registration of DWG because other countries have, and because the USPTO has registered other Autodesk marks with DWG in them and third-party marks with other file format designators in them. All three types of evidence are irrelevant. "Evidence of registration in other countries is not legally or factually relevant to potential consumer perception of [the applicant's] goods in the United States." *In re Bayer AG*, 488 F.3d 960, 969 (Fed. Cir. 2007). Evidence that the USPTO registered arguably

---

[32] Autodesk can be expected to reply that these competitors remain free to assert an affirmative defense, under 15 U.S.C. § 1115(b)(4), that they have engaged only in "fair use" of DWG in a descriptive, non-trademark way. But the difference between free use of a public domain term and the limited § 1115(b)(4) exception for use of a term that serves as one company's trademark is stark. Once one company is awarded exclusive trademark rights in a term, a competitor seeking § 1115(b)(4)'s shelter from the mark owner's threats cannot use the term in a product name, put it in big or distinguishing print or in a logo, or use it repeatedly. Generally, the rule is: just once, in prose. Anything more potentially subjects the user to infringement liability. *See generally* MCCARTHY § 11:46. In light of these severe restrictions, courts have "rejected the contention that registration should be permitted because other producers would remain free to state [the descriptive information] in five minutes in print finer than the name." *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 306 & n.21 (3d Cir. 1986) (discussing *Devcon Corp. v. Woodhill Chem. Sales Corp.*, 455 F.2d 830, 832 (1st Cir.1972)). If the term is in the public domain, however, none of § 1115(b)(4)'s restrictions apply. In particular, other companies can continue to use the descriptive term in their product names, thus aiding consumers by making the most effective communicative use of the term.

similar third-party marks is neither binding nor relevant. *See, e.g.*, *In re Shinnecock Smoke Shop*, 571 F.3d 1171, 1174 (Fed. Cir. 2009); *In re Boulevard Entertainment, Inc*., 334 F.3d 1336, 1343 (Fed Cir 2003); *In re Nett Designs, Inc*., 236 F.3d 1339, 1342 (Fed. Cir. 2001). And the USPTO's registration of the single term marks RASTERDWG and REALDWG do not bear on this case because the USPTO does not require disclaimers of descriptive terms in a mark where two or more terms are combined into a single word. *See* TMEP § 1213.05(a). Here, by contrast, DWG stands alone in all the marks at issue.

**7. Creative Wordsmithing Alone Cannot Create Secondary Meaning Where the Term Nevertheless Stubbornly Retains Its Descriptive Significance to Consumers.**

Autodesk's brief, supporting declarations, and marketing materials go to great creative lengths to try to recast the way it communicates its products' compatibility with DWG file format documents to make it seem like DWG is a trademark. It uses the "TM" symbol. It says that its products use "DWG™ Technology." *See, e.g*., Br. at 6. But even in its brief it acknowledges that this is just another way of saying that its products are compatible with DWG file format. *See* Br. at 6 ("DWG™ technology allows users to view, edit, and save CAD files using Autodesk's proprietary .dwg file format.")[33] Two of its declarants have gone so far as to call all the software products that Autodesk makes which are interoperable with DWG file format drawings the "DWG™ Family of products"—even though the vast majority of these products do not have "DWG" in their name. *See, e.g.*, Genarelli and Hill Decls. Although these declarants (apparently just for purposes of their declarations in this case) define this term to mean "products [that] feature DWG™ technology and use the DWG™ brand," (Genarelli ¶ 4; Hill ¶ 3), as explained above, the term "DWG™ technology" and the depiction of the DWG logo

---

[33] Similarly, Autodesk's declarant, Mr. Maguire, states (¶6) that "DWG™ Technology…enables software users to view, edit and save CAD files in Autodesk's proprietary .dwg file format."

on Autodesk's myriad products are simply fancy ways of communicating to consumers that the products either create or are compatible with DWG files. *See* A1197 (finding that Autodesk uses DWG simultaneously as a file format and as an attempted trademark); *see also* CALLMAN § 20:29, at p. 20-214 ("Use of the 'TM' symbol has little or no effect in altering the commercial impression conveyed by a … descriptive term.").

Autodesk also tries to create a subtle typeface distinction between ".dwg" as a file format indicator and DWG (which it says is a trademark and *not* a file format indicator), but even its own materials do not respect this supposed distinction, using the capital letters DWG when referring to the DWG file format. *See, e.g.*, PTO 886 (AutoCAD 2013 User's Guide Glossary defining "DWG" as "Standard file format for saving vector graphics."); *see also* PTO 155, 169, 176, 212, 222, 235, 790, 801, 886, 1100, 1104-05, 1108-10, 1113, 1137-38, 1147, 1150, 1162, 1165, 1197, 1205, 1239); A178, 209, 211, 763; Buxton Decl. exhs. 3, 6. If Autodesk itself cannot respect this supposed distinction, this only underscores the potential for Autodesk to threaten competitors—who will not be as motivated to be attuned to this supposed trademark/non-trademark distinction—with litigation for misusing "DWG."

**D. Affirming the Refusal to Register Will Neither Hurt Autodesk Nor Preclude It From Seeking Registration in the Future, But It Will Protect Competition.**

Affirming the USPTO's determination does *not* mean that Autodesk cannot *use* its DWG "marks" *exactly the ways it does now*. It can. This case does not concern the right to use marks. In fact, Autodesk may not only continue to *use* these marks, but it may *register* all of the marks at issue (except for DWG by itself) with a disclaimer of DWG, and it may even *enforce* those marks against those competitors who adopt marks that are similar enough to be likely to confuse consumers.

Neither will affirming the TTAB hurt Autodesk. Its remarkable business success amply demonstrates that Autodesk clearly has not *needed* exclusive rights in DWG to be able to effectively market its design-drawing software products. It is, by its own telling, the largest and most successful CAD software company in the country, having earned billions of dollars in revenue—all without having unqualified registrations for these alleged marks, with which to additionally threaten litigation against competitors. Indeed, the evidence shows that Autodesk has hundreds of non-DWG trademarks, pointing out the relatively minor actual role these "DWG trademarks" play in the context of Autodesk's whole business.

And affirming the TTAB's refusal does *not* mean that Autodesk can never register DWG (or register marks containing DWG without a disclaimer). If, in the future, Autodesk provides proof that it has succeeded in its goal of transforming the public's primary perception of DWG from file format into trademark, it can re-apply to register these marks.[34]

Autodesk's position is like that of a company that manufactures a wide range of widget-making machines, and which is trying to obtain the exclusive right to use of the word WIDGET for "manufacturing machines," by virtue of the fact that it puts "WIDGET™" on all its packaging and promotional materials, calls one of its widget-makers "WIDGET TrueFab," says that its machines use "WIDGET™ Technology," and uses WIDGET in a logo: . But, as in this case, the fact remains that all of these uses of the term WIDGET simply communicate what the company's widget-makers make—they make widgets—and consumers of widget-making machines will view WIDGET as simply communicating that fact. This is true even if the company invented the widget and is the biggest maker of widget-making machines. Competitors

---

[34] Secondary meaning is determined at the time registration is sought. TMEP § 1212.01; *see also R. J. Reynolds Tobacco Co. v. American Brands, Inc.*, 493 F.2d 1235, 1238 (CCPA 1974).

in the industry need to remain free to use WIDGET in the names of their competing products to quickly and effectively communicate that their machines, too, make widgets.

Thus, this case is much less about Autodesk's rights than it is about preserving reasonable space for legitimate competition. The law allows a party to claim exclusive rights in a highly-descriptive term only after making a difficult, particularized showing that the consuming public has stopped viewing the term as a descriptive term and primarily has come to view it instead as that company's brand or trademark. Autodesk has shown that it wants, and has worked hard, to achieve that result. But it has not proven that it has, *in fact,* achieved that result. Only when a party has successfully changed public perception of a descriptive term will federal trademark law protect it by conferring the exclusive right to use it on one company—and by so doing restricting competitors from using the term.

## V.   CONCLUSION

The TTAB's decision was not in error.  Autodesk's new evidence and argument are nothing but its prior evidence and arguments dressed in more legally-sophisticated clothing. The Court should affirm the TTAB's decision to refuse registration to these DWG marks.

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY


_____/s/_____

AYANA N. FREE
Assistant United States Attorney
United States Attorney's Office
Justin W. Williams Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone:     (703) 299-3785
Facsimile:     (703) 299-3983
Email:         ayana.free@usdoj.gov

DATED: August 4, 2014                    *Counsel for the Defendant*

                                         *Of Counsel*:

                                         NATHAN K. KELLEY
                                         Solicitor
                                         THOMAS W. KRAUSE
                                         Deputy Solicitor
                                         THOMAS L. CASAGRANDE
                                         CHRISTINA J. HIEBER
                                         Associate Solicitors
                                         United States Patent and Trademark Office
                                         P.O. Box 1450,
                                         Mail Stop 8 – Office of the Solicitor
                                         Alexandria, VA 22313-1450