UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| AUTODESK, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHELLE K. LEE, )<br>)<br>Defendant. )<br>_____ ) | Civil Action No. 1:13-cv-1464 (AJT/JFA) |

## **MEMORANDUM OPINION**

Plaintiff Autodesk, Inc. ("Autodesk") appeals the decision of the United States Patent and Trademark Office (USPTO) to deny trademark registration to the mark "DWG." The case is before the Court on cross-motions for summary judgment. For the reasons stated below, the Defendant's Motion for Summary Judgment is GRANTED, and the Plaintiff's Motion for Summary Judgment is DENIED.

I. Background

Plaintiff Autodesk is a design software company that since the 1980s has developed computer-aided design (CAD) software that is used by architects and engineers to design and build two- and three-dimensional virtual models of buildings, products and other physical objects. Autodesk's most successful and best known product is AutoCAD, and according to Autodesk, its AutoCAD sales have totaled over $11 billion. "DWG" is Autodesk's name for the digital file format and technology underlying AutoCAD. DWG has become one of the most

1

commonly used design data formats; and companies other than Autodesk have developed software using that format. *See, e.g.,* A119, A123, PTO 1095, PTO 1025.[1]

On April 3, 2006, Autodesk filed an application to register five marks covering computer software: DWG, DWG & DESIGN (a design plus word mark), DWG TRUEVIEW, DWG TRUECONVERT, and DWG EXTREME (collectively, "the DWG Application").

On June 9, 2011, the United States Patent and Trademark Office (USPTO) issued Final Office Actions against Autodesk denying the DWG Application on the ground that "DWG" was descriptive and Autodesk failed to establish acquired distinctiveness. Briefly summarized, the USPTO reasoned that "dwg" is the abbreviation for "drawing" and ".dwg" is the file extension on a type of file Autodesk created but which has come to be used descriptively by others in the industry, and for which Autodesk has disavowed any proprietary rights. For these reasons, the USPTO refused to register the DWG and the other marks unless Autodesk disclaimed exclusive rights to "DWG."

On December 8, 2011, Autodesk filed a notice of appeal to the Trademark Trial and Appeal Board (TTAB), which issued an order affirming the USPTO decision on September 30, 2013. On November 27, 2013, Autodesk filed this action to challenge and reverse the TTAB's

---

[1] For example, Autodesk's website describes its DWG technology as "the original and accurate way to store and share design data when working with AutoCAD® software. With billions of DWG files circulating throughout every design industry, it's the world's most commonly used design data format." A119. Similarly, Autodesk's "DWG TrueView" product is described as offering the ability to "view .dwg files with Autodesk® DWG TrueView™ software . . . By installing the free* Autodesk® Design Review software, you can then open .dwg files as well as view, print and track changes to Autodesk 2D and 3D design files without the original design software." PTO 1025.

2

September 30, 2013 decision pursuant to Section 21(b) of the U.S. Trademark Act of 1946 ("the Lanham Act"), 15 U.S.C. § 1071(b).[2]

The parties have filed cross motions for summary judgment. They have also stipulated that the Court should resolve any material factual disputes without any further proceeding based on the summary judgment record before the Court, effectively stipulating to a trial upon stipulated facts.[3] *See* Doc. No. 36. On September 18, 2014, the Court held a hearing on these motions, following which the Court took the motions under advisement.

## II. Standard of Review

Autodesk has introduced evidence in addition to that presented in USPTO proceedings. The Court therefore reviews the record *de novo* and acts as the finder of fact based on the entire record presently before the Court. *See Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 156 (4th Cir. 2014) ("where new evidence is presented to the district court on a disputed fact question, a de novo finding will be necessary to take such evidence into account together with the evidence before the board") (internal citation omitted).

Section 2 of the Lanham Act provides that a mark that is descriptive of the goods in connection with which it is used cannot be registered unless the registrant proves that the mark

---

[2] 5 U.S.C. § 1071(b) permits a party in a trademark suit to contest the TTAB's determination in a new civil action in district court rather than through an appeal to the Federal Circuit. *See Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014).

[3] Autodesk asks the Court to restrict the factual record on which the Court decides the case to those facts in Autodesk's July 2, 2014 statement of undisputed facts [Doc. No. 43]. In support of this request, Autodesk contends that the USPTO violated Local Civil Rule 56 and the Court's Order dated February 24, 2014 [Doc. No. 33], by not including within its brief a separately captioned section listing, in numbered-paragraph form, each material fact that the movant contends is undisputed with appropriate citations to the record. After reviewing this issue, the Court will consider the entire factual record, as presented and discussed by both parties.

has acquired distinctiveness, also called secondary meaning. 15 U.S.C. § 1052(f); *see Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000). "DWG" is, at best, a descriptive mark.[4] To establish secondary meaning, Autodesk must therefore show that "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboraties, Inc.*, 456 U.S. 844, 851 n.11 (1982). However, in order to establish its entitlement to trademark registration, Autodesk must make only a "prima facie showing" of distinctiveness, rather than a conclusive showing. *See Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1576 (Fed. Cir. 1988).

### III. Analysis

The Fourth Circuit has articulated certain non-exhaustive factors relevant to determining secondary meaning *vel non*: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990). "In assessing the existence of secondary meaning, no single factor is determinative ... and every element need not be proved. Each case,

---

[4] Marks fall into the following four categories, in ascending strength or distinctiveness: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See America Online v. AT&T Corp.*, 243 F.3d 812, 816 (4th Cir. 2001). "Generic terms are the common name of a product or service itself, and can *never* be trademarks." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996); *see also CES Pub. Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13 (2d Cir. 1975). "[A] mark which is merely descriptive is considered to be weak and cannot be accorded trade mark protection without proof of secondary meaning, whereas a mark which is either suggestive or arbitrary is strong and presumptively valid." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984) (quoting *Del Laboratories, Inc. v. Alleghany Pharmacal Corp.*, 516 F.Supp. 777, 780 (S.D.N.Y.1981). Courts have acknowledged that the "lines of demarcation between the four classes listed above are not always bright." *Reese Pub. Co. v. Hampton Int'l Commc'ns, Inc.*, 620 F.2d 7, 10 (2d Cir. 1980).

therefore, must be resolved by reference to the relevant factual calculus." *Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.,* 188 F.3d 501 at *4 (4th Cir. 1999). Upon review of the facts pertaining to those considerations, the Court finds that Autodesk has not adequately demonstrated consumer perception that DWG, standing alone, signifies an Autodesk product, as opposed to the DWG digital formatting of products, even though the consumer may think many such products are issued by Autodesk.

(1) Advertising Expenditures

Autodesk points to its significant expenditures, approximately $40-$60 million per year between 2007 and 2013, on advertising and marketing products that incorporate DWG technology (i.e., software that works on and is compatible with dwg formatted files) and display the DWG mark on their packaging. These expenditures, however, have limited, if any, significance with respect to establishing secondary meaning since there is no evidence that these expenditures involve the advertising or marketing of "DWG" as a stand- alone brand name, as opposed to its designation of product functionality within the context of actual Autodesk brand name products, some of which may include the DWG mark or icon. *See* Doc. No. 50 at 15-16, n.19; *see also Carefirst of Maryland, Inc. v. Fire Care, P.C.,* 434 F.3d 263, 270-71 (4th Cir. 2006) (finding that $50 million in advertising expenditures did not establish a registered mark's commercial strength because the mark never appears standing alone); *In re Chem. Dynamics, Inc.,* 839 F.2d 1569 (Fed. Cir. 1988) (concluding that generalized sales and advertising figures do not establish secondary meaning where the alleged mark is not promoted by itself but instead as part of a larger mark or with other designs or marks); and *In re Bongrain Intern. (American) Corp.,* 894 F.2d, 1316, 1318 (Fed. Cir. 1990) ("Growth in sales . . . may indicate the popularity

5

of the product itself rather than recognition of the mark [] as indicative of origin. . ."). In fact, it appears to the Court that Autodesk uses and promotes the DWG label typically in a descriptive sense, to indicate software that works on, or is compatible with, dwg formatted files, as reflected, in part, by the placement of a "DWG" file icon on the back cover of packaging, and at times next to the logo of another company. *See* Doc. No. 50 at 16 & n.19-22; *see also* TTAB Opinion at 24 ("An examination of the sample packaging in the record reveals that the icon is depicted in the back of the packaging, and the primary marks for the product are AUTOCAD and AUTODESK.").

(2) Consumer studies linking the mark to a source

Properly constructed consumer surveys can provide some of the most persuasive evidence of secondary meaning. *See U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 526 n.13 (4th Cir. 2002) ("Survey evidence is generally thought to be the most direct and persuasive way of establishing secondary meaning.") Autodesk relies heavily on two surveys that it conducted, which it contends establish that DWG has acquired the required distinctiveness for trademark protection, one presented in the USPTO proceedings and one prepared nine years after the first, following the TTAB decision, and now part of the record before the Court. The first survey was performed by Dr. Deborah Jay in in 2005-2006 (hereafter "Jay Survey). The second survey was performed by Dr. Gerald Ford in 2014 (hereafter "Ford Survey"). The key question relied on by Autodesk in the Jay Survey asked participants whether they "associate the name or term 'DWG' with design software from any particular company or companies." Of the

308 participants, 42% associated "DWG" exclusively with Autodesk or its product, AudoCAD.[5] The key question in the Ford survey asked participants whether they associated the letters "DWG" with packaging, advertising, or marketing materials for design software from any particular company or companies. 44% reported an association with Autodesk.

To support its claims of secondary meaning, the surveys must demonstrate that consumers perceive DWG as an indicator that Autodesk is the source of a product labeled simply "DWG," not merely that the product has certain functionality associated with DWG or that a product that has DWG functionality has some association with Autodesk. *See Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118 (1938) (party seeking to register trademark "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer"). Here, both surveys suffer from the same fundamental flaw- neither adequately establishes precisely what a participant understood by the term "DWG;" and one would need to speculate whether a participant, in "associating" "DWG" with Autodesk, was identifying a perception that a product labeled "DWG" means that it is an Autodesk proprietary product or that the product has functionality or characteristics of software with the .dwg formatting created and popularized by Autodesk. *See Inwood Laboratories, supra*, 456 U.S. at 851 n.11 ("To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself."); *Wal-Mart Stores, supra,* 529 U.S. at 211 ("[a mark] has developed secondary meaning . . . when, in the minds of the public, the primary significance of a

---

[5] In its proceedings, the USPTO and TTAB found the Jay survey unpersuasive because it did not distinguish between the use of DWG as a trademark and its use as a file extension name. *See* TTAB Opinion at 18.

[mark] is to identify the source of the product rather than the product itself.") (citing *Inwood*); *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1018 (9th Cir. 1979) ("While a "merely descriptive" term is not generally entitled to protection (15 U.S.C. s 1052(e)), if the applicant for registration can show that a "secondary meaning" has attached to the mark, so that the consuming public connects the mark with the producer rather than the product, the mark can be protected."); *see also* MCCARTHY § 15:7 & n.6. In short, the survey results may demonstrate nothing more than that Autodesk is most strongly associated with products using the .dwg file extension (as, indeed, a number of Ford survey respondents affirmatively offered in their answers). *See* Doc. No. 43-3, Appendix A. In fact, the ambiguous nature of the survey results are underscored by Autodesk's own consistent use of DWG descriptively, that is, its use of DWG to refer to the type of digital file that its software creates and the compatibility of software with DWG file formatting. Because neither the Jay nor the Ford surveys adequately reveals the nature of the association a consumer perceives between DWG and Autodesk, the Court cannot conclude that responding consumers necessarily viewed DWG as an Autodesk branded product. *See* TTAB Opinion at 17-20 (analysis of Jay Survey).

(3) Sales success

In further support of its claim of secondary meaning, Autodesk points to its substantial revenues from products bearing the DWG mark. *See* Gennarelli Decl. at ¶ 4-5 ( stating that in each of the years from 2011 until 2014, Autodesk's net revenue for the "DWG Family" of products exceeded $400 million annually, and that to date, "Autodesk has earned over $2.6 billion in revenues from the sale of products in the DWG Family in the U.S."). For the same reasons previously explained with respect to advertising expenditures, the sheer volume of

Autodesk's sales revenue does not establish secondary meaning since the sold products are not branded with an unadorned DWG label, but rather with branding that incorporates DWG as part of a larger mark or with other designs or marks. *See* Doc. No. 50 at 15-16, n.18; *In re Chem. Dynamics, supra*, 839 F.2d at 1571.

(4) Unsolicited media coverage of the product

As evidence of unsolicited media coverage of DWG, Autodesk points to the number of online searches using "dwg" that resulted in visits to the <autodesk.com> or other Autodesk websites. See Buxton Decl. at ¶ 13-14 (stating, based on his analysis, that from January 1, 2013 to April 22, 2014, more than 46,000 visits to Autodesk websites resulted from on-line searches using "dwg" and that from November 1, 2011 to March 31, 2014, "dwg" was included in 16 of the top 200 keywords that users entered into search engine queries to arrive at <autodesk.com>.) It is unclear how or why this data constitutes unsolicited media coverage. *Cf., Venetian Casino Resort, LCC v. Venetiangold.Com*, 380 F.Supp.2d 737, 743 (E.D.Va. 2005) (finding secondary meaning where, among other things, Plaintiff "enjoyed substantial unsolicited media coverage ... including features on all major broadcast and cable networks."). In any event, this internet usage would appear to suggest nothing more than that consumers associate "dwg" with .dwg compatible software products sold by Autodesk.

(5) Attempts to plagiarize the mark

Autodesk also points to seven proceedings it has undertaken to enforce its DWG trademarks, five before the TTAB against the marks DWG CRUISER, RASTERDWG, DWGEDITOR, DWGGATEWAY, and OPENDWG, and two in federal district court relating to Autodesk's TRUSTEDDWG mark and to the third-party mark OPENDWG. *See* Doc. No. 43 at

28. According to Autodesk, these efforts have resulted in competitors relinquishing the right to registrations incorporating DWG. *Id.* But nowhere in the record does it appear that these resolutions were based on the merits of Autodesk's underlying claims; and those settlements could have been motivated by a wide range of factors other than an acknowledgment that DWG, standing alone, constitutes in consumer perception an Autodesk product. *See* Doc. No. 50 at 24-25 (USPTO's noting that none of these actions seems to have involved a disposition in Autodesk's favor on the merits).[6] Autodesk points out that it has obtained foreign trademark registrations for DWG and/or the DWG design mark; but "[e]vidence of registration in other countries is not legally or factually relevant to potential consumer perception of [the applicant's] goods in the United States." *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 969 (Fed. Cir. 2007).

(6) The length and exclusivity of the mark's use

Autodesk also relies on its attaching a trademark symbol to DWG beginning in 2006; that since at least 2003, Autodesk has presented a distinctive file icon (which since 2005 has been the DWG design mark) on the computer screen of users of software products that feature DWG technology; and that since at least 1996, Autodesk has used DWG-related marks in promotional materials. Autodesk also has published a list of trademarks on its website and "DWG" is included on that list. Autodesk also licenses third-party software developers the ability to integrate DWG technology into their products together with the right to use Autodesk's DWG

---

[6] *See also* TTAB Opinion at 28 (finding that "[w]ith respect to the two district court actions, the papers submitted from the action against Dassault Systemes Solidworks Corporation do not reflect a victory for appellant [Autodesk] in the proceeding. The papers from the district court action against the Open Design Alliance reflect a settlement of the action, which did not involve the proposed mark DWG, but involved 'trademark infringement and false designation of origin based on [Open Design Alliance's] improper simulation of Autodesk's TrustedDWG™ authentication mechanism and use of the AUTODESK® trademark. . .").

logo. None of these facts are sufficient to establish that DWG has acquired the necessary secondary meaning. They may reflect Autodesk's efforts to claim or establish a secondary meaning, but the record is insufficient to establish that a secondary meaning has, in fact, been obtained; and the motivation of software developers to enter into licensing agreements, like settling litigants, may be completely unrelated to any acknowledgment that DWG, standing alone, is perceived by consumers as an Autodesk product.

## IV. Conclusion

For the above reasons, the Court finds and concludes that Autodesk has not made a *prima facie* case of distinctiveness. The Court therefore finds and concludes that Autodesk is not entitled to trademark protection with respect to the marks included within the DWG Application. The Court will GRANT the USPTO's Motion for Summary Judgment, DENY Autodesk's Motion for Summary Judgment and enter judgment in favor of defendant USPTO.

The Court will issue an appropriate order.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
October 30, 2014